(Slip Opinion) OCTOBER TERM, 2017 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## EPIC SYSTEMS CORP. *v.* LEWIS

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 16–285. Argued October 2, 2017—Decided May 21, 2018*

In each of these cases, an employer and employee entered into a contract providing for individualized arbitration proceedings to resolve employment disputes between the parties. Each employee nonetheless sought to litigate Fair Labor Standards Act and related state law claims through class or collective actions in federal court. Although the Federal Arbitration Act generally requires courts to enforce arbitration agreements as written, the employees argued that its "saving clause" removes this obligation if an arbitration agreement violates some other federal law and that, by requiring individualized proceedings, the agreements here violated the National Labor Relations Act. The employers countered that the Arbitration Act protects agreements requiring arbitration from judicial interference and that neither the saving clause nor the NLRA demands a different conclusion. Until recently, courts as well as the National Labor Relations Board's general counsel agreed that such arbitration agreements are enforceable. In 2012, however, the Board ruled that the NLRA effectively nullifies the Arbitration Act in cases like these, and since then other courts have either agreed with or deferred to the Board's position.

*Held*: Congress has instructed in the Arbitration Act that arbitration agreements providing for individualized proceedings must be enforced, and neither the Arbitration Act's saving clause nor the NLRA suggests otherwise. Pp. 5–25.

—————

*Together with No. 16–300, *Ernst & Young LLP et al.* v. *Morris et al.*, on certiorari to the United States Court of Appeals for the Ninth Circuit, and No. 16–307, *National Labor Relations Board* v. *Murphy Oil USA, Inc., et al.*, on certiorari to the United States Court of Appeals for the Fifth Circuit.

Syllabus

(a) The Arbitration Act requires courts to enforce agreements to arbitrate, including the terms of arbitration the parties select. See 9 U. S. C. §§2, 3, 4. These emphatic directions would seem to resolve any argument here. The Act's saving clause—which allows courts to refuse to enforce arbitration agreements "upon such grounds as exist at law or in equity for the revocation of any contract," §2—recognizes only "'generally applicable contract defenses, such as fraud, duress, or unconscionability,'" *AT&T Mobility LLC* v. *Concepcion*, 563 U. S. 333, 339, not defenses targeting arbitration either by name or by more subtle methods, such as by "interfer[ing] with fundamental attributes of arbitration," *id.*, at 344. By challenging the agreements precisely because they require individualized arbitration instead of class or collective proceedings, the employees seek to interfere with one of these fundamental attributes. Pp. 5–9.

(b) The employees also mistakenly claim that, even if the Arbitration Act normally requires enforcement of arbitration agreements like theirs, the NLRA overrides that guidance and renders their agreements unlawful yet. When confronted with two Acts allegedly touching on the same topic, this Court must strive "to give effect to both." *Morton* v. *Mancari*, 417 U. S. 535, 551. To prevail, the employees must show a " 'clear and manifest' " congressional intention to displace one Act with another. *Ibid.* There is a "stron[g] presum[ption]" that disfavors repeals by implication and that "Congress will specifically address" preexisting law before suspending the law's normal operations in a later statute. *United States* v. *Fausto*, 484 U. S. 439, 452, 453.

The employees ask the Court to infer that class and collective actions are "concerted activities" protected by §7 of the NLRA, which guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively . . . , and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," 29 U. S. C. §157. But §7 focuses on the right to organize unions and bargain collectively. It does not mention class or collective action procedures or even hint at a clear and manifest wish to displace the Arbitration Act. It is unlikely that Congress wished to confer a right to class or collective actions in §7, since those procedures were hardly known when the NLRA was adopted in 1935. Because the catchall term "other concerted activities for the purpose of . . . other mutual aid or protection" appears at the end of a detailed list of activities, it should be understood to protect the same kind of things, *i.e.,* things employees do for themselves in the course of exercising their right to free association in the workplace.

The NLRA's structure points to the same conclusion. After speak-

ing of various "concerted activities" in §7, the statute establishes a detailed regulatory regime applicable to each item on the list, but gives no hint about what rules should govern the adjudication of class or collective actions in court or arbitration. Nor is it at all obvious what rules should govern on such essential issues as opt-out and opt-in procedures, notice to class members, and class certification standards. Telling too is the fact that Congress has shown that it knows exactly how to specify certain dispute resolution procedures, cf., *e.g.,* 29 U. S. C. §§216(b), 626, or to override the Arbitration Act, see, *e.g.,* 15 U. S. C. §1226(a)(2), but Congress has done nothing like that in the NLRA.

The employees suggest that the NLRA does not discuss class and collective action procedures because it means to confer a right to use *existing* procedures provided by statute or rule, but the NLRA does not say even that much. And if employees do take existing rules as they find them, they must take them subject to those rules' inherent limitations, including the principle that parties may depart from them in favor of individualized arbitration.

In another contextual clue, the employees' underlying causes of action arise not under the NLRA but under the Fair Labor Standards Act, which permits the sort of collective action the employees wish to pursue here. Yet they do not suggest that the FLSA displaces the Arbitration Act, presumably because the Court has held that an identical collective action scheme does not prohibit individualized arbitration proceedings, see *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U. S. 20, 32. The employees' theory also runs afoul of the rule that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions," *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 468, as it would allow a catchall term in the NLRA to dictate the particulars of dispute resolution procedures in Article III courts or arbitration proceedings—matters that are usually left to, *e.g.,* the Federal Rules of Civil Procedure, the Arbitration Act, and the FLSA. Nor does the employees' invocation of the Norris-LaGuardia Act, a predecessor of the NLRA, help their argument. That statute declares unenforceable contracts in conflict with its policy of protecting workers' "concerted activities for the purpose of collective bargaining or other mutual aid or protection," 29 U. S. C. §102, and just as under the NLRA, that policy does not conflict with Congress's directions favoring arbitration.

Precedent confirms the Court's reading. The Court has rejected many efforts to manufacture conflicts between the Arbitration Act and other federal statutes, see, *e.g. American Express Co.* v. *Italian Colors Restaurant*, 570 U. S. 228; and its §7 cases have generally involved efforts related to organizing and collective bargaining in the

workplace, not the treatment of class or collective action procedures in court or arbitration, see, *e.g., NLRB* v. *Washington Aluminum Co.*, 370 U. S. 9.

Finally, the employees cannot expect deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, because *Chevron*'s essential premises are missing. The Board sought not to interpret just the NLRA, "which it administers," *id.,* at 842, but to interpret that statute in a way that limits the work of the Arbitration Act, which the agency does not administer. The Board and the Solicitor General also dispute the NLRA's meaning, articulating no single position on which the Executive Branch might be held "accountable to the people." *Id.,* at 865. And after "employing traditional tools of statutory construction," *id.,* at 843, n. 9, including the canon against reading conflicts into statutes, there is no unresolved ambiguity for the Board to address. Pp. 9–21.

No. 16–285, 823 F. 3d 1147, and No. 16–300, 834 F. 3d 975, reversed and remanded; No. 16–307, 808 F. 3d 1013, affirmed.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, and ALITO, JJ, joined. THOMAS, J., filed a concurring opinion. GINSBURG, J., filed a dissenting opinion, in which BREYER, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 16–285, 16–300, 16–307

EPIC SYSTEMS CORPORATION, PETITIONER

16–285 *v.*

JACOB LEWIS;

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

ERNST & YOUNG LLP, ET AL., PETITIONERS

16–300 *v.*

STEPHEN MORRIS, ET AL.; AND

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

NATIONAL LABOR RELATIONS BOARD, PETITIONER

16–307 *v.*

MURPHY OIL USA, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[May 21, 2018]

JUSTICE GORSUCH delivered the opinion of the Court.

Should employees and employers be allowed to agree that any disputes between them will be resolved through one-on-one arbitration? Or should employees always be permitted to bring their claims in class or collective actions, no matter what they agreed with their employers?

As a matter of policy these questions are surely debatable. But as a matter of law the answer is clear. In the Federal Arbitration Act, Congress has instructed federal courts to enforce arbitration agreements according to their terms—including terms providing for individualized proceedings. Nor can we agree with the employees' suggestion that the National Labor Relations Act (NLRA) offers a conflicting command. It is this Court's duty to interpret Congress's statutes as a harmonious whole rather than at war with one another. And abiding that duty here leads to an unmistakable conclusion. The NLRA secures to employees rights to organize unions and bargain collectively, but it says nothing about how judges and arbitrators must try legal disputes that leave the workplace and enter the courtroom or arbitral forum. This Court has never read a right to class actions into the NLRA—and for three quarters of a century neither did the National Labor Relations Board. Far from conflicting, the Arbitration Act and the NLRA have long enjoyed separate spheres of influence and neither permits this Court to declare the parties' agreements unlawful.

I

The three cases before us differ in detail but not in substance. Take *Ernst & Young LLP* v. *Morris*. There Ernst & Young and one of its junior accountants, Stephen Morris, entered into an agreement providing that they would arbitrate any disputes that might arise between them. The agreement stated that the employee could choose the arbitration provider and that the arbitrator could "grant any relief that could be granted by . . . a court" in the relevant jurisdiction. App. in No. 16–300, p. 43. The agreement also specified individualized arbitration, with claims "pertaining to different [e]mployees [to] be heard in separate proceedings." *Id.,* at 44.

After his employment ended, and despite having agreed

to arbitrate claims against the firm, Mr. Morris sued Ernst & Young in federal court. He alleged that the firm had misclassified its junior accountants as professional employees and violated the federal Fair Labor Standards Act (FLSA) and California law by paying them salaries without overtime pay. Although the arbitration agreement provided for individualized proceedings, Mr. Morris sought to litigate the federal claim on behalf of a nationwide class under the FLSA's collective action provision, 29 U. S. C. §216(b). He sought to pursue the state law claim as a class action under Federal Rule of Civil Procedure 23.

Ernst & Young replied with a motion to compel arbitration. The district court granted the request, but the Ninth Circuit reversed this judgment. 834 F. 3d 975 (2016). The Ninth Circuit recognized that the Arbitration Act generally requires courts to enforce arbitration agreements as written. But the court reasoned that the statute's "saving clause," see 9 U. S. C. §2, removes this obligation if an arbitration agreement violates some other federal law. And the court concluded that an agreement requiring individualized arbitration proceedings violates the NLRA by barring employees from engaging in the "concerted activit[y]," 29 U. S. C. §157, of pursuing claims as a class or collective action.

Judge Ikuta dissented. In her view, the Arbitration Act protected the arbitration agreement from judicial interference and nothing in the Act's saving clause suggested otherwise. Neither, she concluded, did the NLRA demand a different result. Rather, that statute focuses on protecting unionization and collective bargaining in the workplace, not on guaranteeing class or collective action procedures in disputes before judges or arbitrators.

Although the Arbitration Act and the NLRA have long coexisted—they date from 1925 and 1935, respectively— the suggestion they might conflict is something quite new. Until a couple of years ago, courts more or less agreed that

arbitration agreements like those before us must be en-forced according to their terms. See, *e.g., Owen* v. *Bristol Care, Inc.*, 702 F. 3d 1050 (CA8 2013); *Sutherland* v. *Ernst & Young LLP*, 726 F. 3d 290 (CA2 2013); *D. R. Horton, Inc.* v. *NLRB*, 737 F. 3d 344 (CA5 2013); *Iskanian* v. *CLS Transp. Los Angeles, LLC*, 59 Cal. 4th 348, 327 P. 3d 129 (2014); *Tallman* v. *Eighth Jud. Dist. Court*, 131 Nev. 71, 359 P. 3d 113 (2015); 808 F. 3d 1013 (CA5 2015) (case below in No. 16–307).

The National Labor Relations Board's general counsel expressed much the same view in 2010. Remarking that employees and employers "can benefit from the relative simplicity and informality of resolving claims before arbi-trators," the general counsel opined that the validity of such agreements "does not involve consideration of the policies of the National Labor Relations Act." Memoran-dum GC 10–06, pp. 2, 5 (June 16, 2010).

But recently things have shifted. In 2012, the Board—for the first time in the 77 years since the NLRA's adop-tion—asserted that the NLRA effectively nullifies the Arbitration Act in cases like ours. *D. R. Horton, Inc.*, 357 N. L. R. B. 2277. Initially, this agency decision received a cool reception in court. See *D. R. Horton*, 737 F. 3d, at 355–362. In the last two years, though, some circuits have either agreed with the Board's conclusion or thought themselves obliged to defer to it under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). See 823 F. 3d 1147 (CA7 2016) (case below in No. 16–285); 834 F. 3d 975 (case below in No. 16–300); *NLRB* v. *Alternative Entertainment, Inc.*, 858 F. 3d 393 (CA6 2017). More recently still, the disagreement has grown as the Executive has disavowed the Board's (most recent) position, and the Solicitor General and the Board have offered us battling briefs about the law's meaning. We granted certiorari to clear the confusion. 580 U. S. ___ (2017).

## II

We begin with the Arbitration Act and the question of its saving clause.

Congress adopted the Arbitration Act in 1925 in response to a perception that courts were unduly hostile to arbitration. No doubt there was much to that perception. Before 1925, English and American common law courts routinely refused to enforce agreements to arbitrate disputes. *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506, 510, n. 4 (1974). But in Congress's judgment arbitration had more to offer than courts recognized—not least the promise of quicker, more informal, and often cheaper resolutions for everyone involved. *Id.*, at 511. So Congress directed courts to abandon their hostility and instead treat arbitration agreements as "valid, irrevocable, and enforceable." 9 U. S. C. §2. The Act, this Court has said, establishes "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hospital* v. *Mercury Constr. Corp.*, 460 U. S. 1, 24 (1983) (citing *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S. 395 (1967)); see *id.,* at 404 (discussing "the plain meaning of the statute" and "the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts").

Not only did Congress require courts to respect and enforce agreements to arbitrate; it also specifically directed them to respect and enforce the parties' chosen arbitration procedures. See §3 (providing for a stay of litigation pending arbitration "in accordance with the terms of the agreement"); §4 (providing for "an order directing that . . . arbitration proceed in the manner provided for in such agreement"). Indeed, we have often observed that the Arbitration Act requires courts "rigorously" to "enforce arbitration agreements according to their terms, including terms that specify *with whom* the

parties choose to arbitrate their disputes and *the rules under which that arbitration will be conducted.*" *American Express Co.* v. *Italian Colors Restaurant*, 570 U. S. 228, 233 (2013) (some emphasis added; citations, internal quotation marks, and brackets omitted).

On first blush, these emphatic directions would seem to resolve any argument under the Arbitration Act. The parties before us contracted for arbitration. They proceeded to specify the rules that would govern their arbitrations, indicating their intention to use individualized rather than class or collective action procedures. And this much the Arbitration Act seems to protect pretty absolutely. See *AT&T Mobility LLC* v. *Concepcion*, 563 U. S. 333 (2011); *Italian Colors, supra*; *DIRECTV, Inc.* v. *Imburgia*, 577 U. S. ___ (2015). You might wonder if the balance Congress struck in 1925 between arbitration and litigation should be revisited in light of more contemporary developments. You might even ask if the Act was good policy when enacted. But all the same you might find it difficult to see how to avoid the statute's application.

Still, the employees suggest the Arbitration Act's saving clause creates an exception for cases like theirs. By its terms, the saving clause allows courts to refuse to enforce arbitration agreements "upon such grounds as exist at law or in equity for the revocation of any contract." §2. That provision applies here, the employees tell us, because the NLRA renders their particular class and collective action waivers illegal. In their view, illegality under the NLRA is a "ground" that "exists at law . . . for the revocation" of their arbitration agreements, at least to the extent those agreements prohibit class or collective action proceedings.

The problem with this line of argument is fundamental. Put to the side the question whether the saving clause was designed to save not only state law defenses but also defenses allegedly arising from federal statutes. See 834 F. 3d, at 991–992, 997 (Ikuta, J., dissenting). Put to the

side the question of what it takes to qualify as a ground for "revocation" of a contract. See *Concepcion*, *supra,* at 352–355 (THOMAS, J., concurring); *post,* at 1–2 (THOMAS, J., concurring). Put to the side for the moment, too, even the question whether the NLRA actually renders class and collective action waivers illegal. Assuming (but not granting) the employees could satisfactorily answer all those questions, the saving clause still can't save their cause.

It can't because the saving clause recognizes only defenses that apply to "any" contract. In this way the clause establishes a sort of "equal-treatment" rule for arbitration contracts. *Kindred Nursing Centers L. P.* v. *Clark*, 581 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 4). The clause "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Concepcion*, 563 U. S., at 339. At the same time, the clause offers no refuge for "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Ibid.* Under our precedent, this means the saving clause does not save defenses that target arbitration either by name or by more subtle methods, such as by "interfer[ing] with fundamental attributes of arbitration." *Id.*, at 344; see *Kindred Nursing*, *supra,* at \_\_\_ (slip op., at 5).

This is where the employees' argument stumbles. They don't suggest that their arbitration agreements were extracted, say, by an act of fraud or duress or in some other unconscionable way that would render *any* contract unenforceable. Instead, they object to their agreements precisely because they require individualized arbitration proceedings instead of class or collective ones. And by attacking (only) the individualized nature of the arbitration proceedings, the employees' argument seeks to interfere with one of arbitration's fundamental attributes.

We know this much because of *Concepcion*. There this Court faced a state law defense that prohibited as uncon-

scionable class action waivers in consumer contracts. The Court readily acknowledged that the defense formally applied in both the litigation and the arbitration context. 563 U. S., at 338, 341. But, the Court held, the defense failed to qualify for protection under the saving clause because it interfered with a fundamental attribute of arbitration all the same. It did so by effectively permitting any party in arbitration to demand classwide proceedings despite the traditionally individualized and informal nature of arbitration. This "fundamental" change to the traditional arbitration process, the Court said, would "sacrific[e] the principal advantage of arbitration—its informality—and mak[e] the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.,* at 347, 348. Not least, *Concepcion* noted, arbitrators would have to decide whether the named class representatives are sufficiently representative and typical of the class; what kind of notice, opportunity to be heard, and right to opt out absent class members should enjoy; and how discovery should be altered in light of the class-wide nature of the proceedings. *Ibid.* All of which would take much time and effort, and introduce new risks and costs for both sides. *Ibid.* In the Court's judgment, the virtues Congress originally saw in arbitration, its speed and simplicity and inexpensiveness, would be shorn away and arbitration would wind up looking like the litigation it was meant to displace.

Of course, *Concepcion* has its limits. The Court recognized that parties remain free to alter arbitration procedures to suit their tastes, and in recent years some parties have sometimes chosen to arbitrate on a classwide basis. *Id.*, at 351. But *Concepcion*'s essential insight remains: courts may not allow a contract defense to reshape traditional individualized arbitration by mandating classwide arbitration procedures without the parties' consent. *Id.*, at 344–351; see also *Stolt-Nielsen S. A.* v. *AnimalFeeds Int'l*

*Corp.*, 559 U. S. 662, 684–687 (2010). Just as judicial antagonism toward arbitration before the Arbitration Act's enactment "manifested itself in a great variety of devices and formulas declaring arbitration against public policy," *Concepcion* teaches that we must be alert to new devices and formulas that would achieve much the same result today. 563 U. S., at 342 (internal quotation marks omitted). And a rule seeking to declare individualized arbitration proceedings off limits is, the Court held, just such a device.

The employees' efforts to distinguish *Concepcion* fall short. They note that their putative NLRA defense would render an agreement "illegal" as a matter of federal statutory law rather than "unconscionable" as a matter of state common law. But we don't see how that distinction makes any difference in light of *Concepion*'s rationale and rule. Illegality, like unconscionability, may be a traditional, generally applicable contract defense in many cases, including arbitration cases. But an argument that a contract is unenforceable *just because it requires bilateral arbitration* is a different creature. A defense of that kind, *Concepcion* tells us, is one that impermissibly disfavors arbitration whether it sounds in illegality or unconscionability. The law of precedent teaches that like cases should generally be treated alike, and appropriate respect for that principle means the Arbitration Act's saving clause can no more save the defense at issue in these cases than it did the defense at issue in *Concepcion*. At the end of our encounter with the Arbitration Act, then, it appears just as it did at the beginning: a congressional command requiring us to enforce, not override, the terms of the arbitration agreements before us.

## III

But that's not the end of it. Even if the Arbitration Act normally requires us to enforce arbitration agreements

like theirs, the employees reply that the NLRA overrides that guidance in these cases and commands us to hold their agreements unlawful yet.

This argument faces a stout uphill climb. When confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at "liberty to pick and choose among congressional enactments" and must instead strive "'to give effect to both.'" *Morton* v. *Mancari*, 417 U. S. 535, 551 (1974). A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing "'a clearly expressed congressional intention'" that such a result should follow. *Vimar Seguros y Reaseguros, S. A.* v. *M/V Sky Reefer*, 515 U. S. 528, 533 (1995). The intention must be "'clear and manifest.'" *Morton*, *supra*, at 551. And in approaching a claimed conflict, we come armed with the "stron[g] presum[ption]" that repeals by implication are "disfavored" and that "Congress will specifically address" preexisting law when it wishes to suspend its normal operations in a later statute. *United States* v. *Fausto*, 484 U. S. 439, 452, 453 (1988).

These rules exist for good reasons. Respect for Congress as drafter counsels against too easily finding irreconcilable conflicts in its work. More than that, respect for the separation of powers counsels restraint. Allowing judges to pick and choose between statutes risks transforming them from expounders of what the law *is* into policymakers choosing what the law *should be*. Our rules aiming for harmony over conflict in statutory interpretation grow from an appreciation that it's the job of Congress by legislation, not this Court by supposition, both to write the laws and to repeal them.

Seeking to demonstrate an irreconcilable statutory conflict even in light of these demanding standards, the employees point to Section 7 of the NLRA. That provision guarantees workers

"the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U. S. C. §157.

From this language, the employees ask us to infer a clear and manifest congressional command to displace the Arbitration Act and outlaw agreements like theirs.

But that much inference is more than this Court may make.  Section 7 focuses on the right to organize unions and bargain collectively.  It may permit unions to bargain to prohibit arbitration.  Cf. *14 Penn Plaza LLC* v. *Pyett*, 556 U. S. 247, 256–260 (2009).  But it does not express approval or disapproval of arbitration.  It does not mention class or collective action procedures.  It does not even hint at a wish to displace the Arbitration Act—let alone accomplish that much clearly and manifestly, as our precedents demand.

Neither should any of this come as a surprise.  The notion that Section 7 confers a right to class or collective actions seems pretty unlikely when you recall that procedures like that were hardly known when the NLRA was adopted in 1935.  Federal Rule of Civil Procedure 23 didn't create the modern class action until 1966; class arbitration didn't emerge until later still; and even the Fair Labor Standards Act's collective action provision postdated Section 7 by years.  See Rule 23–Class Actions, 28 U. S. C. App., p. 1258 (1964 ed., Supp. II); 52 Stat. 1069; *Concepcion*, 563 U. S., at 349; see also *Califano* v. *Yamasaki*, 442 U. S. 682, 700–701 (1979) (noting that the "usual rule" then was litigation "conducted by and on behalf of individual named parties only").  And while some forms of group litigation existed even in 1935, see 823 F. 3d, at 1154, Section 7's failure to mention them only reinforces that

the statute doesn't speak to such procedures.

A close look at the employees' best evidence of a potential conflict turns out to reveal no conflict at all. The employees direct our attention to the term "other concerted activities for the purpose of . . . other mutual aid or protection." This catchall term, they say, can be read to include class and collective legal actions. But the term appears at the end of a detailed list of activities speaking of "self-organization," "form[ing], join[ing], or assist[ing] labor organizations," and "bargain[ing] collectively." 29 U. S. C. §157. And where, as here, a more general term follows more specific terms in a list, the general term is usually understood to "'embrace only objects similar in nature to those objects enumerated by the preceding specific words.'" *Circuit City Stores, Inc.* v. *Adams*, 532 U. S. 105, 115 (2001) (discussing *ejusdem generis* canon); *National Assn. of Mfrs.* v. *Department of Defense*, 583 U. S. ___, ___ (2018) (slip op., at 10). All of which suggests that the term "other concerted activities" should, like the terms that precede it, serve to protect things employees "just do" for themselves in the course of exercising their right to free association in the workplace, rather than "the highly regulated, courtroom-bound 'activities' of class and joint litigation." *Alternative Entertainment*, 858 F. 3d, at 414–415 (Sutton, J., concurring in part and dissenting in part) (emphasis deleted). None of the preceding and more specific terms speaks to the procedures judges or arbitrators must apply in disputes that leave the workplace and enter the courtroom or arbitral forum, and there is no textually sound reason to suppose the final catchall term should bear such a radically different object than all its predecessors.

The NLRA's broader structure underscores the point. After speaking of various "concerted activities" in Section 7, Congress proceeded to establish a regulatory regime applicable to each of them. The NLRA provides rules for

the recognition of exclusive bargaining representatives, 29 U. S. C. §159, explains employees' and employers' obligation to bargain collectively, §158(d), and conscribes certain labor organization practices, §§158(a)(3), (b). The NLRA also touches on other concerted activities closely related to organization and collective bargaining, such as picketing, §158(b)(7), and strikes, §163. It even sets rules for adjudicatory proceedings under the NLRA itself. §§160, 161. Many of these provisions were part of the original NLRA in 1935, see 49 Stat. 449, while others were added later. But missing entirely from this careful regime is any hint about what rules should govern the adjudication of class or collective actions in court or arbitration. Without some comparably specific guidance, it's not at all obvious what procedures Section 7 might protect. Would opt-out class action procedures suffice? Or would opt-in procedures be necessary? What notice might be owed to absent class members? What standards would govern class certification? Should the same rules always apply or should they vary based on the nature of the suit? Nothing in the NLRA even whispers to us on any of these essential questions. And it is hard to fathom why Congress would take such care to regulate all the other matters mentioned in Section 7 yet remain mute about this matter alone—unless, of course, Section 7 doesn't speak to class and collective action procedures in the first place.

Telling, too, is the fact that when Congress wants to mandate particular dispute resolution procedures it knows exactly how to do so. Congress has spoken often and clearly to the procedures for resolving "actions," "claims," "charges," and "cases" in statute after statute. *E.g.,* 29 U. S. C. §§216(b), 626; 42 U. S. C. §§2000e–5(b), (f)(3)–(5). Congress has likewise shown that it knows how to override the Arbitration Act when it wishes—by explaining, for example, that, "[n]otwithstanding any other provision of law, . . . arbitration may be used . . . only if" certain condi-

tions are met, 15 U. S. C. §1226(a)(2); or that "[n]o predispute arbitration agreement shall be valid or enforceable" in other circumstances, 7 U. S. C. §26(n)(2); 12 U. S. C. §5567(d)(2); or that requiring a party to arbitrate is "unlawful" in other circumstances yet, 10 U. S. C. §987(e)(3). The fact that we have nothing like that here is further evidence that Section 7 does nothing to address the question of class and collective actions.

In response, the employees offer this slight reply. They suggest that the NLRA doesn't discuss any particular class and collective action procedures because it merely confers a right to use *existing* procedures provided by statute or rule, "on the same terms as [they are] made available to everyone else." Brief for Respondent in No. 16–285, p. 53, n. 10. But of course the NLRA doesn't say even that much. And, besides, if the parties really take existing class and collective action rules as they find them, they surely take them subject to the limitations inherent in those rules—including the principle that parties may (as here) contract to depart from them in favor of individualized arbitration procedures of their own design.

Still another contextual clue yields the same message. The employees' underlying causes of action involve their wages and arise not under the NLRA but under an entirely different statute, the Fair Labor Standards Act. The FLSA allows employees to sue on behalf of "themselves and other employees similarly situated," 29 U. S. C. §216(b), and it's precisely this sort of collective action the employees before us wish to pursue. Yet they do not offer the seemingly more natural suggestion that the FLSA overcomes the Arbitration Act to permit their class and collective actions. Why not? Presumably because this Court held decades ago that an identical collective action scheme (in fact, one borrowed from the FLSA) does *not* displace the Arbitration Act or prohibit individualized arbitration proceedings. *Gilmer* v. *Interstate/Johnson*

*Lane Corp.*, 500 U. S. 20, 32 (1991) (discussing Age Discrimination in Employment Act). In fact, it turns out that "[e]very circuit to consider the question" has held that the FLSA allows agreements for individualized arbitration. *Alternative Entertainment*, 858 F. 3d, at 413 (opinion of Sutton, J.) (collecting cases). Faced with that obstacle, the employees are left to cast about elsewhere for help. And so they have cast in this direction, suggesting that one statute (the NLRA) steps in to dictate the procedures for claims under a different statute (the FLSA), and thereby overrides the commands of yet a third statute (the Arbitration Act). It's a sort of interpretive triple bank shot, and just stating the theory is enough to raise a judicial eyebrow.

Perhaps worse still, the employees' theory runs afoul of the usual rule that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 468 (2001). Union organization and collective bargaining in the workplace are the bread and butter of the NLRA, while the particulars of dispute resolution procedures in Article III courts or arbitration proceedings are usually left to other statutes and rules— not least the Federal Rules of Civil Procedure, the Arbitration Act, and the FLSA. It's more than a little doubtful that Congress would have tucked into the mousehole of Section 7's catchall term an elephant that tramples the work done by these other laws; flattens the parties' contracted-for dispute resolution procedures; and seats the Board as supreme superintendent of claims arising under a statute it doesn't even administer.

Nor does it help to fold yet another statute into the mix. At points, the employees suggest that the Norris-LaGuardia Act, a precursor of the NLRA, also renders their arbitration agreements unenforceable. But the

Norris-LaGuardia Act adds nothing here. It declares "[un]enforceable" contracts that conflict with its policy of protecting workers' "concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U. S. C. §§102, 103. That is the same policy the NLRA advances and, as we've seen, it does not conflict with Congress's statutory directions favoring arbitration. See also *Boys Markets, Inc.* v. *Retail Clerks*, 398 U. S. 235 (1970) (holding that the Norris-LaGuardia Act's anti-injunction provisions do not bar enforcement of arbitration agreements).

What all these textual and contextual clues indicate, our precedents confirm. In many cases over many years, this Court has heard and rejected efforts to conjure conflicts between the Arbitration Act and other federal statutes. In fact, this Court has rejected *every* such effort to date (save one temporary exception since overruled), with statutes ranging from the Sherman and Clayton Acts to the Age Discrimination in Employment Act, the Credit Repair Organizations Act, the Securities Act of 1933, the Securities Exchange Act of 1934, and the Racketeer Influenced and Corrupt Organizations Act. *Italian Colors*, 570 U. S. 228; *Gilmer*, 500 U. S. 20; *CompuCredit Corp.* v. *Greenwood*, 565 U. S. 95 (2012); *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477 (1989) (overruling *Wilko* v. *Swan*, 346 U. S. 427 (1953)); *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220 (1987). Throughout, we have made clear that even a statute's express provision for collective legal actions does not necessarily mean that it precludes "'individual attempts at conciliation'" through arbitration. *Gilmer*, *supra,* at 32. And we've stressed that the absence of any specific statutory discussion of arbitration or class actions is an important and telling clue that Congress has not displaced the Arbitration Act. *CompuCredit*, *supra,* at 103–104; *McMahon*, *supra,* at 227; *Italian Colors*, *supra,*

at 234. Given so much precedent pointing so strongly in one direction, we do not see how we might faithfully turn the other way here.

Consider a few examples. In *Italian Colors*, this Court refused to find a conflict between the Arbitration Act and the Sherman Act because the Sherman Act (just like the NLRA) made "no mention of class actions" and was adopted before Rule 23 introduced its exception to the "usual rule" of "individual" dispute resolution. 570 U. S., at 234 (internal quotation marks omitted). In *Gilmer*, this Court "had no qualms in enforcing a class waiver in an arbitration agreement even though" the Age Discrimination in Employment Act "expressly permitted collective legal actions." *Italian Colors*, *supra*, at 237 (citing *Gilmer*, *supra*, at 32). And in *CompuCredit*, this Court refused to find a conflict even though the Credit Repair Organizations Act expressly provided a "right to sue," "repeated[ly]" used the words "action" and "court" and "class action," and even declared "[a]ny waiver" of the rights it provided to be "void." 565 U. S., at 99–100 (internal quotation marks omitted). If all the statutes in all those cases did not provide a congressional command sufficient to displace the Arbitration Act, we cannot imagine how we might hold that the NLRA alone and for the first time does so today.

The employees rejoin that our precedential story is complicated by some of this Court's cases interpreting Section 7 itself. But, as it turns out, this Court's Section 7 cases have usually involved just what you would expect from the statute's plain language: efforts by employees related to organizing and collective bargaining in the workplace, not the treatment of class or collective actions in court or arbitration proceedings. See, *e.g., NLRB* v. *Washington Aluminum Co.*, 370 U. S. 9 (1962) (walkout to protest workplace conditions); *NLRB* v. *Textile Workers*, 409 U. S. 213 (1972) (resignation from union and refusal to strike); *NLRB* v. *J. Weingarten, Inc.*, 420 U. S. 251

(1975) (request for union representation at disciplinary interview). Neither do the two cases the employees cite prove otherwise. In *Eastex, Inc.* v. *NLRB*, 437 U. S. 556, 558 (1978), we simply addressed the question whether a union's distribution of a newsletter in the workplace qualified as a protected concerted activity. We held it did, noting that it was "undisputed that the union undertook the distribution in order to boost its support and improve its bargaining position in upcoming contract negotiations," all part of the union's "'continuing organizational efforts.'" *Id.,* at 575, and n. 24. In *NLRB* v. *City Disposal Systems, Inc.*, 465 U. S. 822, 831–832 (1984), we held only that an employee's assertion of a right under a collective bargaining agreement was protected, reasoning that the collective bargaining "process—beginning with the organization of the union, continuing into the negotiation of a collective-bargaining agreement, and extending through the enforcement of the agreement—is a single, collective activity." Nothing in our cases indicates that the NLRA guarantees class and collective action procedures, let alone for claims arising under different statutes and despite the express (and entirely unmentioned) teachings of the Arbitration Act.

That leaves the employees to try to make something of our dicta. The employees point to a line in *Eastex* observing that "it has been held" by other courts and the Board "that the 'mutual aid or protection' clause protects employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums." 437 U. S*.,* at 565–566; see also Brief for National Labor Relations Board in No. 16–307, p. 15 (citing similar Board decisions). But even on its own terms, this dicta about the holdings of other bodies does not purport to discuss what *procedures* an employee might be entitled to in litigation or arbitration. Instead this passage at most suggests only that

"resort to administrative and judicial forums" isn't "entirely unprotected." *Id.,* at 566. Indeed, the Court proceeded to explain that it did not intend to "address . . . the question of what may constitute 'concerted' activities in this [litigation] context." *Ibid.,* n. 15. So even the employees' dicta, when viewed fairly and fully, doesn't suggest that individualized dispute resolution procedures might be insufficient and collective procedures might be mandatory. Neither should this come as a surprise given that not a single one of the lower court or Board decisions *Eastex* discussed went so far as to hold that Section 7 guarantees a right to class or collective action procedures. As we've seen, the Board did not purport to discover that right until 2012, and no federal appellate court accepted it until 2016. See *D. R. Horton,* 357 N. L. R. B. 2277; 823 F. 3d 1147 (case below in No. 16–285).

With so much against them in the statute and our precedent, the employees end by seeking shelter in *Chevron.* Even if this Court doesn't see what they see in Section 7, the employees say we must rule for them anyway because of the deference this Court owes to an administrative agency's interpretation of the law. To be sure, the employees do not wish us to defer to the general counsel's judgment in 2010 that the NLRA and the Arbitration Act coexist peaceably; they wish us to defer instead to the Board's 2012 opinion suggesting the NLRA displaces the Arbitration Act. No party to these cases has asked us to reconsider *Chevron* deference. Cf. *SAS Institute Inc.* v. *Iancu, ante,* at 11. But even under *Chevron*'s terms, no deference is due. To show why, it suffices to outline just a few of the most obvious reasons.

The *Chevron* Court justified deference on the premise that a statutory ambiguity represents an "implicit" delegation to an agency to interpret a "statute which it administers." 467 U. S., at 841, 844. Here, though, the Board hasn't just sought to interpret its statute, the NLRA, in

isolation; it has sought to interpret this statute in a way that limits the work of a second statute, the Arbitration Act. And on no account might we agree that Congress implicitly delegated to an agency authority to address the meaning of a second statute it does not administer. One of *Chevron*'s essential premises is simply missing here.

It's easy, too, to see why the "reconciliation" of distinct statutory regimes "is a matter for the courts," not agencies. *Gordon* v. *New York Stock Exchange, Inc.*, 422 U. S. 659, 685–686 (1975). An agency eager to advance its statutory mission, but without any particular interest in or expertise with a second statute, might (as here) seek to diminish the second statute's scope in favor of a more expansive interpretation of its own—effectively "'boot-strap[ping] itself into an area in which it has no jurisdiction.'" *Adams Fruit Co.* v. *Barrett*, 494 U. S. 638, 650 (1990). All of which threatens to undo rather than honor legislative intentions. To preserve the balance Congress struck in its statutes, courts must exercise independent interpretive judgment. See *Hoffman Plastic Compounds, Inc.* v. *NLRB*, 535 U. S. 137, 144 (2002) (noting that this Court has "never deferred to the Board's remedial preferences where such preferences potentially trench upon federal statutes and policies unrelated to the NLRA").

Another justification the *Chevron* Court offered for deference is that "policy choices" should be left to Executive Branch officials "directly accountable to the people." 467 U. S., at 865. But here the Executive seems of two minds, for we have received competing briefs from the Board and from the United States (through the Solicitor General) disputing the meaning of the NLRA. And whatever argument might be mustered for deferring to the Executive on grounds of political accountability, surely it becomes a garble when the Executive speaks from both sides of its mouth, articulating no single position on which it might be held accountable. See Hemel & Nielson, *Chev-*

*ron* Step One-and-a-Half, 84 U. Chi. L. Rev. 757, 808 (2017) ("If the theory undergirding *Chevron* is that voters should be the judges of the executive branch's policy choices, then presumably the executive branch should have to take ownership of those policy choices so that voters know whom to blame (and to credit)"). In these circumstances, we will not defer.

Finally, the *Chevron* Court explained that deference is not due unless a "court, employing traditional tools of statutory construction," is left with an unresolved ambiguity. 467 U. S., at 843, n. 9. And that too is missing: the canon against reading conflicts into statutes is a traditional tool of statutory construction and it, along with the other traditional canons we have discussed, is more than up to the job of solving today's interpretive puzzle. Where, as here, the canons supply an answer, "*Chevron* leaves the stage." *Alternative Entertainment*, 858 F. 3d, at 417 (opinion of Sutton, J.).

## IV

The dissent sees things a little bit differently. In its view, today's decision ushers us back to the *Lochner* era when this Court regularly overrode legislative policy judgments. The dissent even suggests we have resurrected the long-dead "yellow dog" contract. *Post,* at 3–17, 30 (opinion of GINSBURG, J.). But like most apocalyptic warnings, this one proves a false alarm. Cf. L. Tribe, American Constitutional Law 435 (1978) ("'*Lochnerizing*' has become so much an epithet that the very use of the label may obscure attempts at understanding").

Our decision does nothing to override Congress's policy judgments. As the dissent recognizes, the legislative policy embodied in the NLRA is aimed at "safeguard[ing], first and foremost, workers' rights to join unions and to engage in collective bargaining." *Post,* at 8. Those rights stand every bit as strong today as they did yesterday. And

rather than revive "yellow dog" contracts against union organizing that the NLRA outlawed back in 1935, today's decision merely declines to read into the NLRA a novel right to class action procedures that the Board's own general counsel disclaimed as recently as 2010.

Instead of overriding Congress's policy judgments, today's decision seeks to honor them. This much the dissent surely knows. Shortly after invoking the specter of *Lochner*, it turns around and criticizes the Court for trying *too hard* to abide the Arbitration Act's "'liberal federal policy favoring arbitration agreements,'" *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U. S. 79, 83 (2002), saying we "'ski'" too far down the "'slippery slope'" of this Court's arbitration precedent, *post,* at 23. But the dissent's real complaint lies with the mountain of precedent itself. The dissent spends page after page relitigating our Arbitration Act precedents, rehashing arguments this Court has heard and rejected many times in many cases that no party has asked us to revisit. Compare *post,* at 18–23, 26 (criticizing *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614 (1985), *Gilmer*, 500 U. S. 20, *Circuit City*, 532 U. S. 105, *Concepcion*, 563 U. S. 333, *Italian Colors*, 570 U. S. 228, and *CompuCredit*, 565 U. S. 95), with *Mitsubishi*, *supra,* at 645–650 (Stevens, J., dissenting), *Gilmer*, *supra,* at 36, 39–43 (Stevens, J., dissenting), *Circuit City*, *supra,* at 124–129 (Stevens, J., dissenting), *Concepcion*, *supra,* at 357–367 (BREYER, J., dissenting), *Italian Colors*, *supra,* at 240–253 (KAGAN, J., dissenting), and *CompuCredit*, *supra,* at 116–117 (GINSBURG, J., dissenting).

When at last it reaches the question of applying our precedent, the dissent offers little, and understandably so. Our precedent clearly teaches that a contract defense "conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures" is inconsistent with the Arbitration Act and

its saving clause. *Concepcion*, *supra*, at 336 (opinion of the Court). And that, of course, is exactly what the employees' proffered defense seeks to do.

Nor is the dissent's reading of the NLRA any more available to us than its reading of the Arbitration Act. The dissent imposes a vast construction on Section 7's language. *Post,* at 9. But a statute's meaning does not always "turn solely" on the broadest imaginable "definitions of its component words." *Yates* v. *United States*, 574 U. S. \_\_\_, \_\_\_ (2015) (plurality opinion) (slip op., at 7). Linguistic and statutory context also matter. We have offered an extensive explanation why those clues support our reading today. By contrast, the dissent rests its interpretation on legislative history. *Post,* at 3–5; see also *post,* at 19–21. But legislative history is not the law. "It is the business of Congress to sum up its own debates in its legislation," and once it enacts a statute "'[w]e do not inquire what the legislature meant; we ask only what the statute means.'" *Schwegmann Brothers* v. *Calvert Distillers Corp.*, 341 U. S. 384, 396, 397 (1951) (Jackson, J., concurring) (quoting Justice Holmes). Besides, when it comes to the legislative history here, it seems Congress "did not discuss the right to file class or consolidated claims against employers." *D. R. Horton*, 737 F. 3d, at 361. So the dissent seeks instead to divine messages from congressional commentary directed to different questions altogether—a project that threatens to "substitute [the Court] for the Congress." *Schwegmann, supra*, at 396.

Nor do the problems end there. The dissent proceeds to argue that its expansive reading of the NLRA conflicts with and should prevail over the Arbitration Act. The NLRA leaves the Arbitration Act without force, the dissent says, because it provides the more "pinpointed" direction. *Post,* at 25. Even taken on its own terms, though, this argument quickly faces trouble. The dissent says the NLRA is the more specific provision because it supposedly

"speaks directly to group action by employees," while the Arbitration Act doesn't speak to such actions. *Ibid.* But the question before us is whether courts must enforce particular arbitration agreements according to their terms. And it's the Arbitration Act that speaks directly to the enforceability of arbitration agreements, while the NLRA doesn't mention arbitration at all. So if forced to choose between the two, we might well say the Arbitration Act offers the more on-point instruction. Of course, there is no need to make that call because, as our precedents demand, we have sought and found a persuasive interpretation that gives effect to all of Congress's work, not just the parts we might prefer.

Ultimately, the dissent retreats to policy arguments. It argues that we should read a class and collective action right into the NLRA to promote the enforcement of wage and hour laws. *Post,* at 26–30. But it's altogether unclear why the dissent expects to find such a right in the NLRA rather than in statutes like the FLSA that actually regulate wages and hours. Or why we should read the NLRA as mandating the availability of class or collective actions when the FLSA expressly authorizes them yet allows parties to contract for bilateral arbitration instead. 29 U. S. C. §216(b); *Gilmer, supra,* at 32. While the dissent is no doubt right that class actions can enhance enforcement by "spread[ing] the costs of litigation," *post,* at 9, it's also well known that they can unfairly "plac[e] pressure on the defendant to settle even unmeritorious claims," *Shady Grove Orthopedic Associates, P. A.* v. *Allstate Ins. Co.*, 559 U. S. 393, 445, n. 3 (2010) (GINSBURG, J., dissenting). The respective merits of class actions and private arbitration as means of enforcing the law are questions constitutionally entrusted not to the courts to decide but to the policymakers in the political branches where those questions remain hotly contested. Just recently, for example, one federal agency banned individualized arbitration agree-

ments it blamed for underenforcement of certain laws, only to see Congress respond by immediately repealing that rule. See 82 Fed. Reg. 33210 (2017) (cited *post,* at 28, n. 15); Pub. L. 115–74, 131 Stat. 1243. This Court is not free to substitute its preferred economic policies for those chosen by the people's representatives. *That,* we had always understood, was *Lochner*'s sin.

\*

The policy may be debatable but the law is clear: Congress has instructed that arbitration agreements like those before us must be enforced as written. While Congress is of course always free to amend this judgment, we see nothing suggesting it did so in the NLRA—much less that it manifested a clear intention to displace the Arbitration Act. Because we can easily read Congress's statutes to work in harmony, that is where our duty lies. The judgments in *Epic*, No. 16–285, and *Ernst & Young*, No. 16–300, are reversed, and the cases are remanded for further proceedings consistent with this opinion. The judgment in *Murphy Oil*, No. 16–307, is affirmed.

*So ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 16–285, 16–300, 16–307

———————

EPIC SYSTEMS CORPORATION, PETITIONER

16–285          *v.*
JACOB LEWIS;

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT


ERNST & YOUNG LLP, ET AL., PETITIONERS

16–300          *v.*
STEPHEN MORRIS, ET AL.; AND

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT


NATIONAL LABOR RELATIONS BOARD, PETITIONER

16–307          *v.*
MURPHY OIL USA, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[May 21, 2018]

JUSTICE THOMAS, concurring.

I join the Court's opinion in full. I write separately to add that the employees also cannot prevail under the plain meaning of the Federal Arbitration Act. The Act declares arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U. S. C. §2. As I have previously explained, grounds for revocation of a contract are those that concern "'the formation of the arbitration agreement.'" *American Express Co.* v. *Italian Colors*

*Restaurant*, 570 U. S. 228, 239 (2013) (concurring opinion) (quoting *AT&T Mobility LLC* v. *Concepcion*, 563 U. S. 333, 353 (2011) (THOMAS, J., concurring)).  The employees argue, among other things, that the class waivers in their arbitration agreements are unenforceable because the National Labor Relations Act makes those waivers illegal. But illegality is a public-policy defense.  See Restatement (Second) of Contracts §§178–179 (1979); *McMullen* v. *Hoffman*, 174 U. S. 639, 669–670 (1899).  Because "[r]efusal to enforce a contract for public-policy reasons does not concern whether the contract was properly made," the saving clause does not apply here. *Concepcion*, *supra*, at 357.  For this reason, and the reasons in the Court's opinion, the employees' arbitration agreements must be enforced according to their terms.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 16–285, 16–300, 16–307

_____

EPIC SYSTEMS CORPORATION, PETITIONER
16–285                 *v.*
JACOB LEWIS;

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT


ERNST & YOUNG LLP, ET AL., PETITIONERS
16–300                 *v.*
STEPHEN MORRIS, ET AL.; AND

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT


NATIONAL LABOR RELATIONS BOARD, PETITIONER
16–307                 *v.*
MURPHY OIL USA, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[May 21, 2018]

JUSTICE GINSBURG, with whom JUSTICE BREYER, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

The employees in these cases complain that their employers have underpaid them in violation of the wage and hours prescriptions of the Fair Labor Standards Act of 1938 (FLSA), 29 U. S. C. §201 *et seq.*, and analogous state laws. Individually, their claims are small, scarcely of a size warranting the expense of seeking redress alone. See Ruan, What's Left To Remedy Wage Theft? How Arbitration Mandates That Bar Class Actions Impact Low-Wage

Workers, 2012 Mich. St. L. Rev. 1103, 1118–1119 (Ruan). But by joining together with others similarly circumstanced, employees can gain effective redress for wage underpayment commonly experienced. See *id.,* at 1108–1111. To block such concerted action, their employers required them to sign, as a condition of employment, arbitration agreements banning collective judicial and arbitral proceedings of any kind. The question presented: Does the Federal Arbitration Act (Arbitration Act or FAA), 9 U. S. C. §1 *et seq.,* permit employers to insist that their employees, whenever seeking redress for commonly experienced wage loss, go it alone, never mind the right secured to employees by the National Labor Relations Act (NLRA), 29 U. S. C. §151 *et seq.,* "to engage in . . . concerted activities" for their "mutual aid or protection"? §157. The answer should be a resounding "No."

In the NLRA and its forerunner, the Norris-LaGuardia Act (NLGA), 29 U. S. C. §101 *et seq.*, Congress acted on an acute awareness: For workers striving to gain from their employers decent terms and conditions of employment, there is strength in numbers. A single employee, Congress understood, is disarmed in dealing with an employer. See *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 33–34 (1937). The Court today subordinates employee-protective labor legislation to the Arbitration Act. In so doing, the Court forgets the labor market imbalance that gave rise to the NLGA and the NLRA, and ignores the destructive consequences of diminishing the right of employees "to band together in confronting an employer." *NLRB* v. *City Disposal Systems, Inc.*, 465 U. S. 822, 835 (1984). Congressional correction of the Court's elevation of the FAA over workers' rights to act in concert is urgently in order.

To explain why the Court's decision is egregiously wrong, I first refer to the extreme imbalance once prevalent in our Nation's workplaces, and Congress' aim in the

NLGA and the NLRA to place employers and employees on a more equal footing. I then explain why the Arbitration Act, sensibly read, does not shrink the NLRA's protective sphere.

I

It was once the dominant view of this Court that "[t]he right of a person to sell his labor upon such terms as he deems proper is . . . the same as the right of the purchaser of labor to prescribe [working] conditions." *Adair* v. *United States*, 208 U. S. 161, 174 (1908) (invalidating federal law prohibiting interstate railroad employers from discharging or discriminating against employees based on their membership in labor organizations); accord *Coppage* v. *Kansas*, 236 U. S. 1, 26 (1915) (invalidating state law prohibiting employers from requiring employees, as a condition of employment, to refrain or withdraw from union membership).

The NLGA and the NLRA operate on a different premise, that employees must have the capacity to act collectively in order to match their employers' clout in setting terms and conditions of employment. For decades, the Court's decisions have reflected that understanding. See *Jones & Laughlin Steel*, 301 U. S. 1 (upholding the NLRA against employer assault); cf. *United States* v. *Darby*, 312 U. S. 100 (1941) (upholding the FLSA).

A

The end of the 19th century and beginning of the 20th was a tumultuous era in the history of our Nation's labor relations. Under economic conditions then prevailing, workers often had to accept employment on whatever terms employers dictated. See 75 Cong. Rec. 4502 (1932). Aiming to secure better pay, shorter workdays, and safer workplaces, workers increasingly sought to band together to make their demands effective. See *ibid.*; H. Millis & E.

Brown, From the Wagner Act to Taft-Hartley: A Study of National Labor Policy and Labor Relations 7–8 (1950).

Employers, in turn, engaged in a variety of tactics to hinder workers' efforts to act in concert for their mutual benefit. See J. Seidman, The Yellow Dog Contract 11 (1932). Notable among such devices was the "yellow-dog contract." Such agreements, which employers required employees to sign as a condition of employment, typically commanded employees to abstain from joining labor unions. See *id.,* at 11, 56. Many of the employer-designed agreements cast an even wider net, "proscrib[ing] all manner of concerted activities." Finkin, The Meaning and Contemporary Vitality of the Norris-LaGuardia Act, 93 Neb. L. Rev. 6, 16 (2014); see Seidman, *supra*, at 59–60, 65–66. As a prominent United States Senator observed, contracts of the yellow-dog genre rendered the "laboring man . . . absolutely helpless" by "waiv[ing] his right . . . to free association" and by requiring that he "singly present any grievance he has." 75 Cong. Rec. 4504 (remarks of Sen. Norris).

Early legislative efforts to protect workers' rights to band together were unavailing. See, *e.g., Coppage*, 236 U. S., at 26; Frankfurter & Greene, Legislation Affecting Labor Injunctions, 38 Yale L. J. 879, 889–890 (1929). Courts, including this one, invalidated the legislation based on then-ascendant notions about employers' and employees' constitutional right to "liberty of contract." See *Coppage*, 236 U. S., at 26; Frankfurter & Greene, *supra,* at 890–891. While stating that legislatures could curtail contractual "liberty" in the interest of public health, safety, and the general welfare, courts placed outside those bounds legislative action to redress the bargaining power imbalance workers faced. See *Coppage*, 236 U. S., at 16–19.

In the 1930's, legislative efforts to safeguard vulnerable workers found more receptive audiences. As the Great

Depression shifted political winds further in favor of worker-protective laws, Congress passed two statutes aimed at protecting employees' associational rights. First, in 1932, Congress passed the NLGA, which regulates the employer-employee relationship indirectly. Section 2 of the Act declares:

> "Whereas . . . the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, . . . it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, . . . and that he shall be free from the interference, restraint, or coercion of employers . . . in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U. S. C. §102.

Section 3 provides that federal courts shall not enforce "any . . . undertaking or promise in conflict with the public policy declared in [§2]." §103.[1] In adopting these provisions, Congress sought to render ineffective employer-imposed contracts proscribing employees' concerted activity of any and every kind. See 75 Cong. Rec. 4504–4505 (remarks of Sen. Norris) ("[o]ne of the objects" of the NLGA was to "outlaw" yellow-dog contracts); Finkin, *supra*, at 16 (contracts prohibiting "all manner of concerted activities apart from union membership or support . . . were understood to be 'yellow dog' contracts"). While banning court enforcement of contracts proscribing con-

—————

[1] Other provisions of the NLGA further rein in federal-court authority to disturb employees' concerted activities. See, *e.g.,* 29 U. S. C. §104(d) (federal courts lack jurisdiction to enjoin a person from "aiding any person participating or interested in any labor dispute who is being proceeded against in, or [who] is prosecuting, any action or suit in any court of the United States or of any State").

certed action by employees, the NLGA did not directly prohibit coercive employer practices.

But Congress did so three years later, in 1935, when it enacted the NLRA. Relevant here, §7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, *and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.*" 29 U. S. C. §157 (emphasis added). Section 8(a)(1) safeguards those rights by making it an "unfair labor practice" for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§7]." §158(a)(1). To oversee the Act's guarantees, the Act established the National Labor Relations Board (Board or NLRB), an independent regulatory agency empowered to administer "labor policy for the Nation." *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 242 (1959); see 29 U. S. C. §160.

Unlike earlier legislative efforts, the NLGA and the NLRA had staying power. When a case challenging the NLRA's constitutionality made its way here, the Court, in retreat from its *Lochner*-era contractual-"liberty" decisions, upheld the Act as a permissible exercise of legislative authority. See *Jones & Laughlin Steel*, 301 U. S., at 33–34. The Court recognized that employees have a "fundamental right" to join together to advance their common interests and that Congress, in lieu of "ignor[ing]" that right, had elected to "safeguard" it. *Ibid.*

B

Despite the NLRA's prohibitions, the employers in the cases now before the Court required their employees to sign contracts stipulating to submission of wage and hours claims to binding arbitration, and to do so only one-by-

one.[2] When employees subsequently filed wage and hours claims in federal court and sought to invoke the collective-litigation procedures provided for in the FLSA and Federal Rules of Civil Procedure,[3] the employers moved to compel individual arbitration. The Arbitration Act, in their view, requires courts to enforce their take-it-or-leave-it arbitration agreements as written, including the collective-litigation abstinence demanded therein.

In resisting enforcement of the group-action foreclosures, the employees involved in this litigation do not urge

---

[2] The Court's opinion opens with the question: "Should employees and employers be allowed to agree that any disputes between them will be resolved through one-on-one arbitration?" *Ante,* at 1. Were the "agreements" genuinely bilateral? Petitioner Epic Systems Corporation e-mailed its employees an arbitration agreement requiring resolution of wage and hours claims by individual arbitration. The agreement provided that if the employees "continue[d] to work at Epic," they would "be deemed to have accepted th[e] Agreement." App. to Pet. for Cert. in No. 16–285, p. 30a. Ernst & Young similarly e-mailed its employees an arbitration agreement, which stated that the employees' continued employment would indicate their assent to the agreement's terms. See App. in No. 16–300, p. 37. Epic's and Ernst & Young's employees thus faced a Hobson's choice: accept arbitration on their employer's terms or give up their jobs.

[3] The FLSA establishes an opt-in collective-litigation procedure for employees seeking to recover unpaid wages and overtime pay. See 29 U. S. C. §216(b). In particular, it authorizes "one or more employees" to maintain an action "in behalf of himself or themselves and other employees similarly situated." *Ibid.* "Similarly situated" employees may become parties to an FLSA collective action (and may share in the recovery) only if they file written notices of consent to be joined as parties. *Ibid.* The Federal Rules of Civil Procedure provide two collective-litigation procedures relevant here. First, Rule 20(a) permits individuals to join as plaintiffs in a single action if they assert claims arising out of the same transaction or occurrence and their claims involve common questions of law or fact. Second, Rule 23 establishes an opt-out class-action procedure, pursuant to which "[o]ne or more members of a class" may bring an action on behalf of the entire class if specified prerequisites are met.

that they must have access to a judicial forum.[4]   They argue only that the NLRA prohibits their employers from denying them the right to pursue work-related claims in concert in any forum.  If they may be stopped by employer-dictated terms from pursuing collective procedures in court, they maintain, they must at least have access to similar procedures in an arbitral forum.

C

Although the NLRA safeguards, first and foremost, workers' rights to join unions and to engage in collective bargaining, the statute speaks more embracively.   In addition to protecting employees' rights "to form, join, or assist labor organizations" and "to bargain collectively through representatives of their own choosing," the Act protects employees' rights "to engage in *other* concerted activities for the purpose of . . . mutual aid or protection." 29 U. S. C. §157 (emphasis added); see, *e.g., NLRB* v. *Washington Aluminum Co.*, 370 U. S. 9, 14–15 (1962) (§7 protected unorganized employees when they walked off the job to protest cold working conditions).  See also 1 J. Higgins, The Developing Labor Law 209 (6th ed. 2012) ("Section 7 protects not only union-related activity but also 'other concerted activities . . . for mutual aid or protection.'"); 1 N. Lareau, Labor and Employment Law §1.01[1], p. 1–2 (2017) ("Section 7 extended to employees three federally protected rights: (1) the right to form and join unions; (2) the right to bargain collectively (negotiate) with employers about terms and conditions of employment; *and* (3) the right to work in concert with another employee or employees to achieve employment-related goals." (emphasis added)).

———————

[4] Notably, one employer specified that if the provisions confining employees to individual proceedings are "unenforceable," "any claim brought on a class, collective, or representative action basis must be filed in . . . court."  App. to Pet. for Cert. in No. 16–285, at 35a.

Suits to enforce workplace rights collectively fit comfortably under the umbrella "concerted activities for the purpose of . . . mutual aid or protection." 29 U. S. C. §157. "Concerted" means "[p]lanned or accomplished together; combined." American Heritage Dictionary 381 (5th ed. 2011). "Mutual" means "reciprocal." *Id.,* at 1163. When employees meet the requirements for litigation of shared legal claims in joint, collective, and class proceedings, the litigation of their claims is undoubtedly "accomplished together." By joining hands in litigation, workers can spread the costs of litigation and reduce the risk of employer retaliation. See *infra,* at 27–28.

Recognizing employees' right to engage in collective employment litigation and shielding that right from employer blockage are firmly rooted in the NLRA's design. Congress expressed its intent, when it enacted the NLRA, to "protec[t] the exercise by workers of full freedom of association," thereby remedying "[t]he inequality of bargaining power" workers faced. 29 U. S. C. §151; see, *e.g., Eastex, Inc.* v. *NLRB*, 437 U. S. 556, 567 (1978) (the Act's policy is "to protect the right of workers to act together to better their working conditions" (internal quotation marks omitted)); *City Disposal*, 465 U. S., at 835 ("[I]n enacting §7 of the NLRA, Congress sought generally to equalize the bargaining power of the employee with that of his employer by allowing employees to band together in confronting an employer regarding the terms and conditions of their employment."). See also *supra,* at 5–6. There can be no serious doubt that collective litigation is one way workers may associate with one another to improve their lot.

Since the Act's earliest days, the Board and federal courts have understood §7's "concerted activities" clause to protect myriad ways in which employees may join together to advance their shared interests. For example, the Board and federal courts have affirmed that the Act shields employees from employer interference when they partici-

pate in concerted appeals to the media, *e.g., NLRB* v. *Peter Cailler Kohler Swiss Chocolates Co.*, 130 F. 2d 503, 505–506 (CA2 1942), legislative bodies, *e.g., Bethlehem Shipbuilding Corp.* v. *NLRB*, 114 F. 2d 930, 937 (CA1 1940), and government agencies, *e.g., Moss Planing Mill Co.*, 103 N. L. R. B. 414, 418–419, enf'd, 206 F. 2d 557 (CA4 1953). "The 74th Congress," this Court has noted, "knew well enough that labor's cause often is advanced on fronts other than collective bargaining and grievance settlement within the immediate employment context." *Eastex*, 437 U. S., at 565.

Crucially important here, for over 75 years, the Board has held that the NLRA safeguards employees from employer interference when they pursue joint, collective, and class suits related to the terms and conditions of their employment. See, *e.g., Spandsco Oil and Royalty Co.*, 42 N. L. R. B. 942, 948–949 (1942) (three employees' joint filing of FLSA suit ranked as concerted activity protected by the NLRA); *Poultrymen's Service Corp.*, 41 N. L. R. B. 444, 460–463, and n. 28 (1942) (same with respect to employee's filing of FLSA suit on behalf of himself and others similarly situated), enf'd, 138 F. 2d 204 (CA3 1943); *Sarkes Tarzian, Inc.*, 149 N. L. R. B. 147, 149, 153 (1964) (same with respect to employees' filing class libel suit); *United Parcel Service, Inc.*, 252 N. L. R. B. 1015, 1018 (1980) (same with respect to employee's filing class action regarding break times), enf'd, 677 F. 2d 421 (CA6 1982); *Harco Trucking, LLC*, 344 N. L. R. B. 478, 478–479 (2005) (same with respect to employee's maintaining class action regarding wages). For decades, federal courts have endorsed the Board's view, comprehending that "the filing of a labor related civil action by a group of employees is ordinarily a concerted activity protected by §7." *Leviton Mfg. Co.* v. *NLRB*, 486 F. 2d 686, 689 (CA1 1973); see, *e.g., Brady* v. *National Football League*, 644 F. 3d 661, 673

(CA8 2011) (similar).[5]  The Court pays scant heed to this longstanding line of decisions.[6]

### D

In face of the NLRA's text, history, purposes, and longstanding construction, the Court nevertheless concludes that collective proceedings do not fall within the scope of §7.  None of the Court's reasons for diminishing §7 should carry the day.

### 1

The Court relies principally on the *ejusdem generis* canon.  See *ante,* at 12.  Observing that §7's "other concerted activities" clause "appears at the end of a detailed list of activities," the Court says the clause should be read

---

[5] The Court cites, as purported evidence of contrary agency precedent, a 2010 "Guideline Memorandum" that the NLRB's then-General Counsel issued to his staff.  See *ante,* at 4, 19, 22.  The General Counsel appeared to conclude that employees have a §7 right to file collective suits, but that employers can nonetheless require employees to sign arbitration agreements waiving the right to maintain such suits.  See Memorandum GC 10–06, p. 7 (June 16, 2010).  The memorandum sought to address what the General Counsel viewed as tension between longstanding precedent recognizing a §7 right to pursue collective employment litigation and more recent court decisions broadly construing the FAA.  The memorandum did not bind the Board, and the Board never adopted the memorandum's position as its own.  See *D. R. Horton,* 357 N. L. R. B. 2277, 2282 (2012), enf. denied in relevant part, 737 F. 3d 344 (CA5 2013); Tr. of Oral Arg. 41.  Indeed, shortly after the General Counsel issued the memorandum, the Board rejected its analysis, finding that it conflicted with Board precedent, rested on erroneous factual premises, "defie[d] logic," and was internally incoherent.  *D. R. Horton,* 357 N. L. R. B., at 2282–2283.

[6] In 2012, the Board held that employer-imposed contracts barring group litigation in any forum—arbitral or judicial—are unlawful.  *D. R. Horton,* 357 N. L. R. B. 2277.  In so ruling, the Board simply applied its precedents recognizing that (1) employees have a §7 right to engage in collective employment litigation and (2) employers cannot lawfully require employees to sign away their §7 rights.  See *id.,* at 2278, 2280. It broke no new ground.  But cf. *ante,* at 2, 19.

to "embrace" only activities "similar in nature" to those set forth first in the list, *ibid.* (internal quotation marks omitted), *i.e.,* "'self-organization,' 'form[ing], join[ing], or assist[ing] labor organizations,' and 'bargain[ing] collectively,'" *ibid.* The Court concludes that §7 should, therefore, be read to protect "things employees 'just do' for themselves." *Ibid.* (quoting *NLRB* v. *Alternative Entertainment, Inc.*, 858 F. 3d 393, 415 (CA6 2017) (Sutton, J., concurring in part and dissenting in part); emphasis deleted). It is far from apparent why joining hands in litigation would not qualify as "things employees just do for themselves." In any event, there is no sound reason to employ the *ejusdem generis* canon to narrow §7's protections in the manner the Court suggests.

The *ejusdem generis* canon may serve as a useful guide where it is doubtful Congress intended statutory words or phrases to have the broad scope their ordinary meaning conveys. See *Russell Motor Car Co.* v. *United States*, 261 U. S. 514, 519 (1923). Courts must take care, however, not to deploy the canon to undermine Congress' efforts to draft encompassing legislation. See *United States* v. *Powell*, 423 U. S. 87, 90 (1975) ("[W]e would be justified in narrowing the statute only if such a narrow reading was supported by evidence of congressional intent over and above the language of the statute."). Nothing suggests that Congress envisioned a cramped construction of the NLRA. Quite the opposite, Congress expressed an embracive purpose in enacting the legislation, *i.e.,* to "protec[t] the exercise by workers of full freedom of association." 29 U. S. C. §151; see *supra,* at 9.

### 2

In search of a statutory hook to support its application of the *ejusdem generis* canon, the Court turns to the NLRA's "structure." *Ante,* at 12. Citing a handful of provisions that touch upon unionization, collective bar-

gaining, picketing, and strikes, the Court asserts that the NLRA "establish[es] a regulatory regime" governing each of the activities protected by §7. *Ante,* at 12–13. That regime, the Court says, offers "specific guidance" and "rules" regulating each protected activity. *Ante,* at 13. Observing that none of the NLRA's provisions explicitly regulates employees' resort to collective litigation, the Court insists that "it is hard to fathom why Congress would take such care to regulate all the other matters mentioned in [§7] yet remain mute about this matter alone—unless, of course, [§7] doesn't speak to class and collective action procedures in the first place." *Ibid.*

This argument is conspicuously flawed. When Congress enacted the NLRA in 1935, the only §7 activity Congress addressed with any specificity was employees' selection of collective-bargaining representatives. See 49 Stat. 453. The Act did not offer "specific guidance" about employees' rights to "form, join, or assist labor organizations." Nor did it set forth "specific guidance" for any activity falling within §7's "other concerted activities" clause. The only provision that touched upon an activity falling within that clause stated: "Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike." *Id.,* at 457. That provision hardly offered "specific guidance" regarding employees' right to strike.

Without much in the original Act to support its "structure" argument, the Court cites several provisions that Congress added later, in response to particular concerns. Compare 49 Stat. 449–457 with 61 Stat. 142–143 (1947) (adding §8(d) to provide guidance regarding employees' and employers' collective-bargaining obligations); 61 Stat. 141–142 (amending §8(a) and adding §8(b) to proscribe specified labor organization practices); 73 Stat. 544 (1959) (adding §8(b)(7) to place restrictions on labor organizations' right to picket employers). It is difficult to comprehend why Congress' later inclusion of specific guidance

regarding some of the activities protected by §7 sheds any light on Congress' initial conception of §7's scope.

But even if each of the provisions the Court cites had been included in the original Act, they still would provide little support for the Court's conclusion. For going on 80 years now, the Board and federal courts—including this one—have understood §7 to protect numerous activities for which the Act provides no "specific" regulatory guidance. See *supra,* at 9–10.

3

In a related argument, the Court maintains that the NLRA does not "even whispe[r]" about the "rules [that] should govern the adjudication of class or collective actions in court or arbitration." *Ante,* at 13. The employees here involved, of course, do not look to the NLRA for the procedures enabling them to vindicate their employment rights in arbitral or judicial forums. They assert that the Act establishes their right to act in concert using existing, generally available procedures, see *supra,* at 7, n. 3, and to do so free from employer interference. The FLSA and the Federal Rules on joinder and class actions provide the procedures pursuant to which the employees may ally to pursue shared legal claims. Their employers cannot lawfully cut off their access to those procedures, they urge, without according them access to similar procedures in arbitral forums. See, *e.g.,* American Arbitration Assn., Supplementary Rules for Class Arbitrations (2011).

To the employees' argument, the Court replies: If the employees "really take existing class and collective action rules as they find them, they surely take them subject to the limitations inherent in those rules—including the principle that parties may (as here) contract to depart from them in favor of individualized arbitration procedures." *Ante,* at 14. The freedom to depart asserted by the Court, as already underscored, is entirely one sided.

See *supra,* at 2–5. Once again, the Court ignores the reality that sparked the NLRA's passage: Forced to face their employers without company, employees ordinarily are no match for the enterprise that hires them. Employees gain strength, however, if they can deal with their employers in numbers. That is the very reason why the NLRA secures against employer interference employees' right to act in concert for their "mutual aid or protection." 29 U. S. C. §§151, 157, 158.

4

Further attempting to sow doubt about §7's scope, the Court asserts that class and collective procedures were "hardly known when the NLRA was adopted in 1935." *Ante,* at 11. In particular, the Court notes, the FLSA's collective-litigation procedure postdated §7 "by years" and Rule 23 "didn't create the modern class action until 1966." *Ibid.*

First, one may ask, is there any reason to suppose that Congress intended to protect employees' right to act in concert using only those procedures and forums available in 1935? Congress framed §7 in broad terms, "entrust[ing]" the Board with "responsibility to adapt the Act to changing patterns of industrial life." *NLRB* v. *J. Weingarten, Inc.*, 420 U. S. 251, 266 (1975); see *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 212 (1998) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (internal quotation marks omitted)). With fidelity to Congress' aim, the Board and federal courts have recognized that the NLRA shields employees from employer interference when they, *e.g.,* join together to file complaints with administrative agencies, even if those agencies did not exist in 1935. See, *e.g., Wray Electric Contracting, Inc.,* 210 N. L. R. B. 757, 762 (1974) (the NLRA protects concerted filing of

complaint with the Occupational Safety and Health Administration).

Moreover, the Court paints an ahistorical picture. As Judge Wood, writing for the Seventh Circuit, cogently explained, the FLSA's collective-litigation procedure and the modern class action were "not written on a clean slate." 823 F. 3d 1147, 1154 (2016). By 1935, permissive joinder was scarcely uncommon in courts of equity. See 7 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §1651 (3d ed. 2001). Nor were representative and class suits novelties. Indeed, their origins trace back to medieval times. See S. Yeazell, From Medieval Group Litigation to the Modern Class Action 38 (1987). And beyond question, "[c]lass suits long have been a part of American jurisprudence." 7A Wright, *supra*, §1751, at 12 (3d ed. 2005); see *Supreme Tribe of Ben-Hur* v. *Cauble*, 255 U. S. 356, 363 (1921). See also Brief for Constitutional Accountability Center as *Amicus Curiae* 5–16 (describing group litigation's "rich history"). Early instances of joint proceedings include cases in which employees allied to sue an employer. *E.g., Gorley* v. *Louisville*, 23 Ky. 1782, 65 S. W. 844 (1901) (suit to recover wages brought by ten members of city police force on behalf of themselves and other officers); *Guiliano* v. *Daniel O'Connell's Sons*, 105 Conn. 695, 136 A. 677 (1927) (suit by two employees to recover for injuries sustained while residing in housing provided by their employer). It takes no imagination, then, to comprehend that Congress, when it enacted the NLRA, likely meant to protect employees' joining together to engage in collective litigation.[7]

_____

[7] The Court additionally suggests that something must be amiss because the employees turn to the NLRA, rather than the FLSA, to resist enforcement of the collective-litigation waivers. See *ante,* at 14–15. But the employees' reliance on the NLRA is hardly a reason to "raise a judicial eyebrow." *Ante,* at 15. The NLRA's guiding purpose is to protect employees' rights to work together when addressing shared

E

Because I would hold that employees' §7 rights include the right to pursue collective litigation regarding their wages and hours, I would further hold that the employer-dictated collective-litigation stoppers, *i.e.,* "waivers," are unlawful. As earlier recounted, see *supra,* at 6, §8(a)(1) makes it an "unfair labor practice" for an employer to "interfere with, restrain, or coerce" employees in the exercise of their §7 rights. 29 U. S. C. §158(a)(1). Beyond genuine dispute, an employer "interfere[s] with" and "restrain[s]" employees in the exercise of their §7 rights by mandating that they prospectively renounce those rights in individual employment agreements.[8] The law could hardly be otherwise: Employees' rights to band together to meet their employers' superior strength would be worth precious little if employers could condition employment on workers signing away those rights. See *National Licorice Co.* v. *NLRB*, 309 U. S. 350, 364 (1940). Properly assessed, then, the "waivers" rank as unfair labor practices outlawed by the NLRA, and therefore unenforceable in court. See *Kaiser Steel Corp.* v. *Mullins*, 455 U. S. 72, 77 (1982) ("[O]ur cases leave no doubt that illegal promises will not be enforced in cases controlled by the federal law.").[9]

———————

workplace grievances of whatever kind.

[8] See, *e.g., Bethany Medical Center*, 328 N. L. R. B. 1094, 1105–1106 (1999) (holding employer violated §8(a)(1) by conditioning employees' rehiring on the surrender of their right to engage in future walkouts); *Mandel Security Bureau Inc.*, 202 N. L. R. B. 117, 119, 122 (1973) (holding employer violated §8(a)(1) by conditioning employee's reinstatement to former position on agreement that employee would refrain from filing charges with the Board and from circulating work-related petitions, and, instead, would "mind his own business").

[9] I would similarly hold that the NLGA renders the collective-litigation waivers unenforceable. That Act declares it the public policy of the United States that workers "shall be free from the interference, restraint, or coercion of employers" when they engage in "concerted

II

Today's decision rests largely on the Court's finding in the Arbitration Act "emphatic directions" to enforce arbitration agreements according to their terms, including collective-litigation prohibitions. *Ante,* at 6. Nothing in the FAA or this Court's case law, however, requires subordination of the NLRA's protections. Before addressing the

---

activities" for their "mutual aid or protection." 29 U. S. C. §102; see *supra,* at 5. Section 3 provides that federal courts shall not enforce any "promise in conflict with the [Act's] policy." §103. Because employer-extracted collective-litigation waivers interfere with employees' ability to engage in "concerted activities" for their "mutual aid or protection," see *supra,* at 8–11, the arm-twisted waivers collide with the NLGA's stated policy; thus, no federal court should enforce them. See Finkin, The Meaning and Contemporary Vitality of the Norris-LaGuardia Act, 93 Neb. L. Rev. 6 (2014).

*Boys Markets, Inc.* v. *Retail Clerks*, 398 U. S. 235 (1970), provides no support for the Court's contrary conclusion. See *ante*, at 16. In *Boys Markets*, an employer and a union had entered into a collective-bargaining agreement, which provided that labor disputes would be resolved through arbitration and that the union would not engage in strikes, pickets, or boycotts during the life of the agreement. 398 U. S., at 238–239. When a dispute later arose, the union bypassed arbitration and called a strike. *Id.,* at 239. The question presented: Whether a federal district court could enjoin the strike and order the parties to arbitrate their dispute. The case required the Court to reconcile the NLGA's limitations on federal courts' authority to enjoin employees' concerted activities, see 29 U. S. C. §104, with §301(a) of the Labor Management Relations Act, 1947, which grants federal courts the power to enforce collective-bargaining agreements, see 29 U. S. C. §185(a). The Court concluded that permitting district courts to enforce no-strike and arbitration provisions in collective-bargaining agreements would encourage employers to enter into such agreements, thereby furthering federal labor policy. 398 U. S., at 252–253. That case has little relevance here. It did not consider the enforceability of arbitration provisions that require employees to arbitrate disputes only one-by-one. Nor did it consider the enforceability of arbitration provisions that an employer has unilaterally imposed on employees, as opposed to provisions negotiated through collective-bargaining processes in which employees can leverage their collective strength.

interaction between the two laws, I briefly recall the FAA's history and the domain for which that Act was designed.

## A

### 1

Prior to 1925, American courts routinely declined to order specific performance of arbitration agreements. See Cohen & Dayton, The New Federal Arbitration Law, 12 Va. L. Rev. 265, 270 (1926). Growing backlogs in the courts, which delayed the resolution of commercial disputes, prompted the business community to seek legislation enabling merchants to enter into binding arbitration agreements. See *id.,* at 265. The business community's aim was to secure to merchants an expeditious, economical means of resolving their disputes. See *ibid.* The American Bar Association's Committee on Commerce, Trade and Commercial Law took up the reins in 1921, drafting the legislation Congress enacted, with relatively few changes, four years later. See Committee on Commerce, Trade & Commercial Law, The United States Arbitration Law and Its Application, 11 A. B. A. J. 153 (1925).

The legislative hearings and debate leading up to the FAA's passage evidence Congress' aim to enable merchants of roughly equal bargaining power to enter into binding agreements to arbitrate *commercial* disputes. See, *e.g.,* 65 Cong. Rec. 11080 (1924) (remarks of Rep. Mills) ("This bill provides that where there are commercial contracts and there is disagreement under the contract, the court can [en]force an arbitration agreement in the same way as other portions of the contract."); Joint Hearings on S. 1005 and H. R. 646 before the Subcommittees of the Committees on the Judiciary, 68th Cong., 1st Sess. (1924) (Joint Hearings) (consistently focusing on the need for binding arbitration of commercial disputes).[10]

———————

[10] American Bar Association member Julius H. Cohen, credited with

The FAA's legislative history also shows that Congress did not intend the statute to apply to arbitration provisions in employment contracts. In brief, when the legislation was introduced, organized labor voiced concern. See Hearing on S. 4213 and S. 4214 before the Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess., 9 (1923) (Hearing). Herbert Hoover, then Secretary of Commerce, suggested that if there were "objection[s]" to including "workers' contracts in the law's scheme," Congress could amend the legislation to say: "but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in interstate or foreign commerce." *Id.,* at 14. Congress adopted Secretary Hoover's suggestion virtually verbatim in §1 of the Act, see Joint Hearings 2; 9 U. S. C. §1, and labor expressed no further opposition, see H. R. Rep. No. 96, 68th Cong., 1st Sess., 1 (1924).[11]

Congress, it bears repetition, envisioned application of the Arbitration Act to voluntary, negotiated agreements. See, *e.g.,* 65 Cong. Rec. 1931 (remarks of Rep. Graham) (the FAA provides an "opportunity to enforce . . . an agreement to arbitrate, when voluntarily placed in the

_____

drafting the legislation, wrote shortly after the FAA's passage that the law was designed to provide a means of dispute resolution "particularly adapted to the settlement of commercial disputes." Cohen & Dayton, The New Federal Arbitration Law, 12 Va. L. Rev. 265, 279 (1926). Arbitration, he and a colleague explained, is "peculiarly suited to the disposition of the ordinary disputes between merchants as to questions of fact—quantity, quality, time of delivery, compliance with terms of payment, excuses for non-performance, and the like." *Id.,* at 281. "It has a place also," they noted, "in the determination of the simpler questions of law" that "arise out of th[e] daily relations between merchants, [for example,] the passage of title, [and] the existence of warranties." *Ibid.*

[11] For fuller discussion of Congress' intent to exclude employment contracts from the FAA's scope, see *Circuit City Stores, Inc.* v. *Adams*, 532 U. S. 105, 124–129 (2001) (Stevens, J., dissenting).

document by the parties to it"). Congress never endorsed a policy favoring arbitration where one party sets the terms of an agreement while the other is left to "take it or leave it." Hearing 9 (remarks of Sen. Walsh) (internal quotation marks omitted); see *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S. 395, 403, n. 9 (1967) ("We note that categories of contracts otherwise within the Arbitration Act but in which one of the parties characteristically has little bargaining power are expressly excluded from the reach of the Act. See §1.").

2

In recent decades, this Court has veered away from Congress' intent simply to afford merchants a speedy and economical means of resolving commercial disputes. See Sternlight, Panacea or Corporate Tool?: Debunking the Supreme Court's Preference for Binding Arbitration, 74 Wash. U. L. Q. 637, 644–674 (1996) (tracing the Court's evolving interpretation of the FAA's scope). In 1983, the Court declared, for the first time in the FAA's then 58-year history, that the FAA evinces a "liberal federal policy favoring arbitration." *Moses H. Cone Memorial Hospital* v. *Mercury Constr. Corp.*, 460 U. S. 1, 24 (1983) (involving an arbitration agreement between a hospital and a construction contractor). Soon thereafter, the Court ruled, in a series of cases, that the FAA requires enforcement of agreements to arbitrate not only contract claims, but statutory claims as well. *E.g., Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614 (1985); *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220 (1987). Further, in 1991, the Court concluded in *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U. S. 20, 23 (1991), that the FAA requires enforcement of agreements to arbitrate claims arising under the Age Discrimination in Employment Act of 1967, a workplace antidiscrimination statute. Then, in 2001, the Court ruled in *Circuit City*

*Stores, Inc.* v. *Adams*, 532 U. S. 105, 109 (2001), that the Arbitration Act's exemption for employment contracts should be construed narrowly, to exclude from the Act's scope only transportation workers' contracts.

Employers have availed themselves of the opportunity opened by court decisions expansively interpreting the Arbitration Act. Few employers imposed arbitration agreements on their employees in the early 1990's. After *Gilmer* and *Circuit City*, however, employers' exaction of arbitration clauses in employment contracts grew steadily. See, *e.g.,* Economic Policy Institute (EPI), A. Colvin, The Growing Use of Mandatory Arbitration 1–2, 4 (Sept. 27, 2017), available at https://www.epi.org/files/pdf/135056.pdf (All Internet materials as visited May 18, 2018) (data indicate only 2.1% of nonunionized companies imposed mandatory arbitration agreements on their employees in 1992, but 53.9% do today). Moreover, in response to sub-sequent decisions addressing class arbitration,[12] employ-ers have increasingly included in their arbitration agree-ments express group-action waivers. See Ruan 1129;

---

[12] In *Green Tree Financial Corp.* v. *Bazzle*, 539 U. S. 444 (2003), a plurality suggested arbitration might proceed on a class basis where not expressly precluded by an agreement. After *Bazzle*, companies increasingly placed explicit collective-litigation waivers in consumer and employee arbitration agreements. See Gilles, Opting Out of Liability: The Forthcoming, Near-Total Demise of the Modern Class Action, 104 Mich. L. Rev. 373, 409–410 (2005). In *AT&T Mobility LLC* v. *Concepcion*, 563 U. S. 333 (2011), and *American Express Co.* v. *Italian Colors Restaurant*, 570 U. S. 228 (2013), the Court held enforce-able class-action waivers in the arbitration agreements at issue in those cases. No surprise, the number of companies incorporating express class-action waivers in consumer and employee arbitration agreements spiked. See 2017 Carlton Fields Class Action Survey: Best Practices in Reducing Cost and Managing Risk in Class Action Litigation 29 (2017), available at https://www.classactionsurvey.com/pdf/2017-class-action-survey.pdf (reporting that 16.1% of surveyed companies' arbitration agreements expressly precluded class actions in 2012, but 30.2% did so in 2016).

Colvin, *supra*, at 6 (estimating that 23.1% of nonunionized employees are now subject to express class-action waivers in mandatory arbitration agreements). It is, therefore, this Court's exorbitant application of the FAA—stretching it far beyond contractual disputes between merchants—that led the NLRB to confront, for the first time in 2012, the precise question whether employers can use arbitration agreements to insulate themselves from collective employment litigation. See *D. R. Horton*, 357 N. L. R. B. 2277 (2012), enf. denied in relevant part, 737 F. 3d 344 (CA5 2013). Compare *ante,* at 3–4 (suggesting the Board broke new ground in 2012 when it concluded that the NLRA prohibits employer-imposed arbitration agreements that mandate individual arbitration) with *supra,* at 10–11 (NLRB decisions recognizing a §7 right to engage in collective employment litigation), and *supra,* at 17, n. 8 (NLRB decisions finding employer-dictated waivers of §7 rights unlawful).

As I see it, in relatively recent years, the Court's Arbitration Act decisions have taken many wrong turns. Yet, even accepting the Court's decisions as they are, nothing compels the destructive result the Court reaches today. Cf. R. Bork, The Tempting of America 169 (1990) ("Judges . . . live on the slippery slope of analogies; they are not supposed to ski it to the bottom.").

### B

Through the Arbitration Act, Congress sought "to make arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint*, 388 U. S., at 404, n. 12. Congress thus provided in §2 of the FAA that the terms of a written arbitration agreement "shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*" 9 U. S. C. §2 (emphasis added). Pursuant to this "saving clause," arbitration agreements and terms may be invali-

dated based on "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Doctor's Associates, Inc.* v. *Casarotto*, 517 U. S. 681, 687 (1996); see *ante,* at 7.

Illegality is a traditional, generally applicable contract defense. See 5 R. Lord, Williston on Contracts §12.1 (4th ed. 2009). "[A]uthorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract." *Kaiser Steel*, 455 U. S., at 77 (quoting *McMullen* v. *Hoffman*, 174 U. S. 639, 654 (1899)). For the reasons stated *supra,* at 8–17, I would hold that the arbitration agreements' employer-dictated collective-litigation waivers are unlawful. By declining to enforce those adhesive waivers, courts would place them on the same footing as any other contract provision incompatible with controlling federal law. The FAA's saving clause can thus achieve harmonization of the FAA and the NLRA without undermining federal labor policy.

The Court urges that our case law—most forcibly, *AT&T Mobility LLC* v. *Concepcion*, 563 U. S. 333 (2011)—rules out reconciliation of the NLRA and the FAA through the latter's saving clause. See *ante,* at 6–9. I disagree. True, the Court's Arbitration Act decisions establish that the saving clause "offers no refuge" for defenses that discriminate against arbitration, "either by name or by more subtle methods." *Ante,* at 7. The Court, therefore, has rejected saving clause salvage where state courts have invoked generally applicable contract defenses to discriminate "covertly" against arbitration. *Kindred Nursing Centers L. P.* v. *Clark*, 581 U. S. ___, ___ (2017) (slip op., at 5). In *Concepcion*, the Court held that the saving clause did not spare the California Supreme Court's invocation of unconscionability doctrine to establish a rule blocking enforcement of class-action waivers in adhesive consumer contracts. 563 U. S., at 341–344, 346–352. Class proceed-

ings, the Court said, would "sacrific[e] the principal advantage of arbitration—its informality—and mak[e] the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.,* at 348. Accordingly, the Court concluded, the California Supreme Court's rule, though derived from unconscionability doctrine, impermissibly disfavored arbitration, and therefore could not stand. *Id.,* at 346–352.

Here, however, the Court is not asked to apply a generally applicable contract defense to generate a rule discriminating against arbitration. At issue is application of the ordinarily superseding rule that "illegal promises will not be enforced," *Kaiser Steel*, 455 U. S., at 77, to invalidate arbitration provisions at odds with the NLRA, a pathmarking federal statute. That statute neither discriminates against arbitration on its face, nor by covert operation. It requires invalidation of *all* employer-imposed contractual provisions prospectively waiving employees' §7 rights. See *supra,* at 17, and n. 8; cf. *Kindred Nursing Centers*, 581 U. S., at \_\_\_, n. 2 (slip op., at 7, n. 2) (States may enforce generally applicable rules so long as they do not "single out arbitration" for disfavored treatment).

C

Even assuming that the FAA and the NLRA were inharmonious, the NLRA should control. Enacted later in time, the NLRA should qualify as "an implied repeal" of the FAA, to the extent of any genuine conflict. See *Posadas* v. *National City Bank*, 296 U. S. 497, 503 (1936). Moreover, the NLRA should prevail as the more pinpointed, subject-matter specific legislation, given that it speaks directly to group action by employees to improve the terms and conditions of their employment. See *Radzanower* v. *Touche Ross & Co.*, 426 U. S. 148, 153 (1976) ("a specific statute" generally "will not be controlled or nullified by a

general one" (internal quotation marks omitted)).[13]

Citing statutory examples, the Court asserts that when Congress wants to override the FAA, it does so expressly. See *ante,* at 13–14. The statutes the Court cites, however, are of recent vintage.[14] Each was enacted during the time this Court's decisions increasingly alerted Congress that it would be wise to leave not the slightest room for doubt if it wants to secure access to a judicial forum or to provide a green light for group litigation before an arbitrator or court. See *CompuCredit Corp.* v. *Greenwood*, 565 U. S. 95, 116 (2012) (GINSBURG, J., dissenting). The Congress that drafted the NLRA in 1935 was scarcely on similar alert.

## III

The inevitable result of today's decision will be the underenforcement of federal and state statutes designed to advance the well-being of vulnerable workers. See generally Sternlight, Disarming Employees: How American Employers Are Using Mandatory Arbitration To Deprive Workers of Legal Protections, 80 Brooklyn L. Rev. 1309 (2015).

The probable impact on wage and hours claims of the kind asserted in the cases now before the Court is all too evident. Violations of minimum-wage and overtime laws are widespread. See Ruan 1109–1111; A. Bernhardt et al., Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities 11–16, 21–22 (2009). One study estimated that in Chicago, Los

---

[13] Enacted, as was the NLRA, after passage of the FAA, the NLGA also qualifies as a statute more specific than the FAA. Indeed, the NLGA expressly addresses the enforceability of contract provisions that interfere with employees' ability to engage in concerted activities. See *supra,* at 17, n. 9. Moreover, the NLGA contains an express repeal provision, which provides that "[a]ll acts and parts of acts in conflict with [the Act's] provisions . . . are repealed." 29 U. S. C. §115.

[14] See 116 Stat. 1836 (2002); 120 Stat. 2267 (2006); 124 Stat. 1746 (2010); 124 Stat. 2035 (2010).

Angeles, and New York City alone, low-wage workers lose nearly $3 billion in legally owed wages each year. *Id.*, at 6. The U. S. Department of Labor, state labor departments, and state attorneys general can uncover and obtain recoveries for some violations. See EPI, B. Meixell & R. Eisenbrey, An Epidemic of Wage Theft Is Costing Workers Hundreds of Millions of Dollars a Year 2 (2014), available at https://www.epi.org/files/2014/wage-theft.pdf. Because of their limited resources, however, government agencies must rely on private parties to take a lead role in enforcing wage and hours laws. See Brief for State of Maryland et al. as *Amici Curiae* 29–33; Glover, The Structural Role of Private Enforcement Mechanisms in Public Law, 53 Wm. & Mary L. Rev. 1137, 1150–1151 (2012) (Department of Labor investigates fewer than 1% of FLSA-covered employers each year).

If employers can stave off collective employment litigation aimed at obtaining redress for wage and hours infractions, the enforcement gap is almost certain to widen. Expenses entailed in mounting individual claims will often far outweigh potential recoveries. See *id.*, at 1184–1185 (because "the FLSA systematically tends to generate low-value claims," "mechanisms that facilitate the economics of claiming are required"); *Sutherland* v. *Ernst & Young LLP*, 768 F. Supp. 2d 547, 552 (SDNY 2011) (finding that an employee utilizing Ernst & Young's arbitration program would likely have to spend $200,000 to recover only $1,867.02 in overtime pay and an equivalent amount in liquidated damages); cf. Resnik, Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights, 124 Yale L. J. 2804, 2904 (2015) (analyzing available data from the consumer context to conclude that "private enforcement of small-value claims depends on collective, rather than individual, action"); *Amchem Products, Inc.* v. *Windsor*, 521 U. S. 591, 617 (1997) (class actions help "overcome the problem that

small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights" (internal quotation marks omitted)).[15]

Fear of retaliation may also deter potential claimants from seeking redress alone. See, *e.g.,* Ruan 1119–1121; Bernhardt, *supra*, at 3, 24–25. Further inhibiting single-file claims is the slim relief obtainable, even of the injunctive kind. See *Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established."). The upshot: Employers, aware that employees will be disinclined to pursue small-value claims when confined to proceeding one-by-one, will no doubt perceive that the cost-benefit balance of underpaying workers tips heavily in favor of skirting legal obligations.

In stark contrast to today's decision,[16] the Court has repeatedly recognized the centrality of group action to the effective enforcement of antidiscrimination statutes. With Court approbation, concerted legal actions have played a critical role in enforcing prohibitions against workplace discrimination based on race, sex, and other protected characteristics. See, *e.g., Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971); *Automobile Workers* v. *Johnson Controls, Inc.*, 499 U. S. 187 (1991). In this context, the Court has comprehended that government entities charged with enforcing antidiscrimination statutes are unlikely to be funded at levels that could even begin to compensate for a significant dropoff in private enforcement efforts. See

———————

[15] Based on a 2015 study, the Bureau of Consumer Financial Protection found that "pre-dispute arbitration agreements are being widely used to prevent consumers from seeking relief from legal violations on a class basis, and that consumers rarely file individual lawsuits or arbitration cases to obtain such relief." 82 Fed. Reg. 33210 (2017).

[16] The Court observes that class actions can be abused, see *ante,* at 24, but under its interpretation, even two employees would be stopped from proceeding together.

*Newman* v. *Piggie Park Enterprises, Inc.*, 390 U. S. 400, 401 (1968) (*per curiam*) ("When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law."). That reality, as just noted, holds true for enforcement of wage and hours laws. See *supra,* at 27.

I do not read the Court's opinion to place in jeopardy discrimination complaints asserting disparate-impact and pattern-or-practice claims that call for proof on a group-wide basis, see Brief for NAACP Legal Defense & Educational Fund, Inc., et al. as *Amici Curiae* 19–25, which some courts have concluded cannot be maintained by solo complainants, see, *e.g., Chin* v. *Port Auth. of N. Y. & N. J.*, 685 F. 3d 135, 147 (CA2 2012) (pattern-or-practice method of proving race discrimination is unavailable in non-class actions). It would be grossly exorbitant to read the FAA to devastate Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e *et seq.*, and other laws enacted to eliminate, root and branch, class-based employment discrimination, see *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 417, 421 (1975). With fidelity to the Legislature's will, the Court could hardly hold otherwise.

I note, finally, that individual arbitration of employee complaints can give rise to anomalous results. Arbitration agreements often include provisions requiring that outcomes be kept confidential or barring arbitrators from giving prior proceedings precedential effect. See, *e.g.,* App. to Pet. for Cert. in No. 16–285, p. 34a (Epic's agreement); App. in No. 16–300, p. 46 (Ernst & Young's agreement). As a result, arbitrators may render conflicting awards in cases involving similarly situated employees—even employees working for the same employer. Arbitrators may resolve differently such questions as whether certain jobs are exempt from overtime laws. Cf. *Encino Motor Cars,*

*LLC* v. *Navarro, ante,* p. ___ (Court divides on whether "service advisors" are exempt from overtime-pay require- ments). With confidentiality and no-precedential-value provisions operative, irreconcilable answers would remain unchecked.

\* \* \*

If these untoward consequences stemmed from legisla- tive choices, I would be obliged to accede to them. But the edict that employees with wage and hours claims may seek relief only one-by-one does not come from Congress. It is the result of take-it-or-leave-it labor contracts hark- ing back to the type called "yellow dog," and of the readi- ness of this Court to enforce those unbargained-for agree- ments. The FAA demands no such suppression of the right of workers to take concerted action for their "mutual aid or protection." Accordingly, I would reverse the judg- ment of the Fifth Circuit in No. 16–307 and affirm the judgments of the Seventh and Ninth Circuits in Nos. 16– 285 and 16–300.