# United States Court of Appeals
## For the First Circuit

No. 25-1993

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Highways and Transportation Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative of the Puerto Rico Public Buildings Authority,

Debtors,

JONATHAN HERNÁNDEZ ZORRILLA; YADIRA CARRASQUILLO GONZÁLEZ,

Movants, Appellees,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico,

Debtor, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain,* U.S. District Judge]

---

* Of the Southern District of New York, sitting by designation.

Before

Montecalvo, Howard, and Kayatta,
Circuit Judges.

———————————

Lucas Kowalczyk, with whom Timothy W. Mungovan, John E. Roberts, Adam L. Deming, Brian S. Rosen, Mark D. Harris, and Proskauer Rose LLP were on brief, for appellant.

Steven P. Lausell Recurt, with whom Inter-American University of PR Legal Aid Clinic, Fermín L. Arraiza-Navas, Annette Martínez-Orabona, and American Civil Liberties Union Puerto Rico Chapter were on brief, for appellees.

———————————

June 12, 2026

———————————

**KAYATTA**, <u>Circuit Judge</u>.  With the confirmation of its Plan of Adjustment under Title III of PROMESA, the Commonwealth of Puerto Rico (the "Commonwealth") received a broad discharge of various claims and an injunction barring the pursuit of those discharged claims.  The issue raised in this appeal is whether that discharge and injunction apply to claims against officers or employees of the Commonwealth in their personal capacities.  As we will explain, we agree with the Title III court that the Commonwealth's discharge does not apply to personal-capacity claims and that such claims are therefore not subject to any injunction impeding their prosecution.

**I.**

Congress enacted PROMESA (short for the Puerto Rico Oversight, Management, and Economic Stability Act) in 2016 in response to the "fiscal emergency" in Puerto Rico.  48 U.S.C. § 2194(m); <u>see also</u> <u>id.</u> §§ 2101–2241 (codifying PROMESA).  PROMESA seeks to "facilitate restructuring of [the Commonwealth's] public debt, ensure its future access to capital markets, and provide for its long-term economic stability."  <u>Pierluisi</u> v. <u>Fin. Oversight & Mgmt. Bd. for P.R.</u> (<u>In re Fin. Oversight & Mgmt. Bd. for P.R.</u>), 37 F.4th 746, 750 (1st Cir. 2022).  To those ends, PROMESA created "a modified version of the municipal bankruptcy code" in Title III of its provisions, established the Financial Oversight and Management Board (the "Board"), and "authorized the Board to place the

- 3 -

Commonwealth and its instrumentalities into bankruptcy proceedings and to develop a plan of adjustment for restructuring the Commonwealth's debts." Fin. Oversight & Mgmt. Bd. for P.R. v. Federacion de Maestros de P.R., Inc. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 32 F.4th 67, 74-75 (1st Cir. 2022); see 48 U.S.C. § 2121(a), (b)(1), (c)(1); id. §§ 2161-2178.

Beginning in May 2017, the Board commenced Title III restructuring cases on behalf of the Commonwealth and several of its instrumentalities. See 48 U.S.C. § 2164(a). Upon initiation of those restructuring cases, certain claims against the Commonwealth and its relevant instrumentalities were automatically stayed pending resolution of those proceedings. 11 U.S.C. §§ 362, 922 (automatically staying certain claims upon initiation of a bankruptcy petition); 48 U.S.C. § 2161(a) (incorporating Sections 362 and 922 of the Bankruptcy Code into PROMESA).

**II.**

**A.**

The events giving rise to appellees' claims occurred a year later, while those restructuring cases were making their way through the Title III court. According to their complaints, on May 1, 2018, appellees Hernández Zorrilla and Carrasquillo González attended a demonstration in San Juan, Puerto Rico. There, they allege, members of the Puerto Rico Police Bureau (PRPB) used "physical aggression, threats and assault" against them, including

- 4 -

tear gas and, in the case of Hernández Zorrilla, rubber bullets or "similar ammunition." In re Fin. Oversight & Mgmt. Bd. for P.R., 802 F. Supp. 3d 350, 355 (D.P.R. 2025) (quoting complaints).

In April 2019, appellees each filed suit in the U.S. District Court for the District of Puerto Rico, alleging that the PRPB officers' conduct and certain policies of the PRPB violated their rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution and various sections of the Puerto Rico Constitution and Puerto Rico Civil Code. The suits named as defendants the then-Governor of Puerto Rico and other officials and employees of the Commonwealth, including employees of the PRPB. In addition to seeking declaratory and injunctive relief, the suits sought monetary damages from defendants in their personal capacities. The suits were consolidated in 2021.

According to the Board, the Commonwealth assumed financial responsibility for defending these suits under a Commonwealth law known as Law 9. Law 9 allows certain employees and officials sued in their personal capacities to ask the Commonwealth to "provide [them] with legal representation, and to subsequently assume the payment of any judgment" entered against them. P.R. Laws Ann. tit. 32, § 3085. The Board concedes that, subject to limited exceptions, the decisions to defend and to indemnify under Law 9 are both discretionary. The Commonwealth's agreement to defend an employee or official does not necessarily

- 5 -

mean it will also indemnify that employee or official; rather, the Commonwealth makes its indemnification decision only "after considering the findings of the court or which arise from the evidence presented" in the case. Id. § 3087.

**B.**

Back in the Title III court, in January 2022 -- after years of mediation and negotiation -- the court confirmed a Plan of Adjustment for the Commonwealth and two of its instrumentalities (the "Commonwealth Plan" or the "Plan"). In re Fin Oversight & Mgmt. Bd. for P.R., 636 B.R. 1, 56-244 (D.P.R. 2022) [hereinafter Comm. Plan]; see Federacion de Maestros, 32 F.4th at 75. The Title III court entered a Confirmation Order, In re Fin. Oversight & Mgmt. Bd. for P.R., 636 B.R. at 1 [hereinafter Conf. Order], and issued Findings of Fact and Conclusions of Law, In re Fin. Oversight & Mgmt. Bd. for P.R., 637 B.R. 223 (D.P.R. 2022) [hereinafter FFCL], which were "incorporated [into the Confirmation Order] as though set forth in full" therein, Conf. Order ¶ 3.[1] The confirmed Commonwealth Plan went into effect on

_____

[1] In addition to being published in the Bankruptcy Reporter, the Commonwealth Plan, Confirmation Order, and Findings of Fact and Conclusions of Law are all available to the public online for free. Commonwealth of Puerto Rico, Kroll Restructuring Admin., https://cases.ra.kroll.com/puertorico/Home-DocketInfo [https://perma.cc/FL4A-KMZC] (last visited June 10, 2026). When citing to these documents, for ease of reference and for consistency with the Title III court's treatment, we point to the numbered sections and paragraphs contained therein rather than

March 15, 2022, discharging certain claims against the Commonwealth and enjoining the pursuit of discharged claims. See id. ¶¶ 56, 59.

The district court stayed appellees' case pending a determination by the Title III court as to whether the confirmed Commonwealth Plan discharged their claims and thus left them subject to the injunction barring the pursuit of discharged claims. On September 30, 2025, the Title III court issued an Opinion and Order concluding that appellees' personal-capacity claims against Commonwealth officials and employees are not barred by the confirmed Commonwealth Plan and that appellees were therefore free to proceed with their suit.[2] In re Fin. Oversight & Mgmt. Bd., 802 F. Supp. 3d at 355. The Board timely appealed.

**III.**

We turn now to the Board's claims on appeal, reviewing the Title III court's factual findings for clear error and its legal conclusions de novo. Federacion de Maestros, 32 F.4th at 76.

The Board asserts that the Title III court erred in finding that the confirmed Commonwealth Plan does not discharge or

_____

page numbers, which vary between the Bankruptcy Reporter and the publicly available documents.

[2] The Board consented to permitting the nonmonetary claims for injunctive and declaratory relief to proceed.

- 7 -

call for enjoining proceedings against Commonwealth employees or officials in their personal capacities. According to the Board, this was error because, under this court's decision in Víctor J. Salgado & Associates Inc. v. Cestero-Lopategui, 34 F.4th 49 (1st Cir. 2022), the personal-capacity claims are "indirect claims" against the Commonwealth. In the Board's view, the only relevant question is whether these personal-capacity claims function as claims against the Commonwealth. If they do, the Board argues, then they have been discharged.

We disagree. The question is not simply whether these suits press claims against the Commonwealth. The question is whether these particular claims fall within the subset of claims discharged by the confirmed Commonwealth Plan. And as we will explain, even assuming appellees' suits do function as indirect claims against the Commonwealth, these suits -- as maintained against officers or employees in their personal capacities -- are not within that group of claims that the Commonwealth Plan discharges.

**A.**

We begin with our decision in Salgado, then explain why the outcome of that case does not control the outcome of this one.

PROMESA incorporates two provisions of the Bankruptcy Code to automatically stay certain actions during Title III restructuring proceedings, so as to give the Commonwealth "a

- 8 -

limited period of time during which it can focus its resources on negotiating a voluntary resolution with its creditors." 48 U.S.C. § 2194(n)(2); see also id. § 2161(a) (incorporating Sections 362 and 922 of the Bankruptcy Code into PROMESA).[3] The first provision, Section 362, automatically stays "action[s] or proceeding[s] against the debtor." 11 U.S.C. § 362(a)(1). "[I]n addition to" actions stayed by Section 362, the second provision, Section 922, also stays "action[s] or proceeding[s] against an officer or inhabitant of the debtor that seek[] to enforce a claim against the debtor." Id. § 922(a)(1).

In Salgado, we confronted the question of whether personal-capacity suits against Commonwealth officials were "action[s] or proceeding[s] against an officer" of the Commonwealth "that seek[] to enforce a claim against the debtor" within the meaning of Section 922. See 34 F.4th at 53. We reasoned that the "very existence" of Section 922 "makes clear that for automatic stay purposes, an action can seek to enforce a claim against a governmental debtor even if it only does so indirectly." Id. at 53–54. Otherwise, "Section 922 would have little if any role at all because actions brought directly against the debtor are already stayed by Section 362." Id. at 53. We concluded that

---

[3] The automatic stay created by these provisions preceded, and was replaced by, the permanent injunction in the confirmed Commonwealth Plan. 11 U.S.C. § 362(c)(2)(C); Comm. Plan § 92.25.

the personal-capacity suits at issue, in which the Commonwealth was already footing the defense bill under Law 9 and faced pressure to indemnify based on the considerable damages sought, fell within Section 922 because, as a practical matter, they targeted the Commonwealth's fisc. Id. at 54-56. The permissive, rather than mandatory, nature of indemnification under Law 9 did not demand a different result because the Bankruptcy Code (in a provision incorporated into PROMESA) defines claims broadly, to include "contingent" and "disputed" "right[s] to payment." Id. at 54 (alteration in original) (quoting 11 U.S.C. § 101(5)); see 48 U.S.C. § 2161(a).

The Board argues Salgado's holding forces our hand here. The Board sees no relevant distinction between the stay and the confirmed Commonwealth Plan's discharge provisions, arguing that "[t]he scope of the stay and the scope of the discharge both rise or fall" with the definition of "claim." But, by focusing on the text of the Commonwealth Plan and Confirmation Order, the Board's own arguments implicitly recognize that there is more to the analysis. It cannot be that any claim that was automatically stayed must necessarily also have been discharged; if that were so, then most of the years-long process of negotiating the shape and scope of the resolution of the various and numerous claims against the Commonwealth under the Commonwealth Plan would have been for naught. And it makes sense that the automatic stay and

the discharge would not be coextensive because they carry drastically different consequences: While the former only pauses a claim to give the Commonwealth "a limited period of time" to focus on "negotiating" with its creditors, 48 U.S.C. § 2194(n)(2), the latter "forever waive[s] and discharge[s]" a claim, Conf. Order. ¶ 56(b).

Salgado addressed a claim that, while facially against an employee, also functioned as an indirect claim against the debtor. 34 F.4th at 53-54. So the court had to decide, in the absence of any agreement between the parties, how to apply the automatic stay provisions to such a claim. Here, we have the same dual-faced claim, but the question now is what the confirmed Commonwealth Plan, not Section 922 of the Bankruptcy Code, says about the treatment of that claim.[4] To answer that question, we look -- as the Board does -- to the language of that Plan.

**B.**

**1.**

Three documents govern the scope of the discharge effected by the confirmed Commonwealth Plan: (1) the Commonwealth Plan itself, (2) the Title III court's Confirmation Order, and (3) the Findings of Fact and Conclusions of Law incorporated into

---

[4] For this reason, we reject the Board's argument that deciding personal-capacity claims are not discharged by the Commonwealth Plan would give the term "claim" different meanings at different points in the Title III process.

- 11 -

the Confirmation Order. The Commonwealth Plan and Confirmation Order are "construed in a manner consistent with each other so as to effect the purpose of each," but insofar as they conflict, the Confirmation Order prevails. Conf. Order ¶ 84.

The Confirmation Order discharges and releases "all Claims or Causes of Action against the Debtors and Reorganized Debtors that arose, in whole or in part, prior to the Effective Date," "[e]xcept as expressly provided in the Plan or [Confirmation Order]." Id. ¶ 56(a). It precludes "all Entities . . . from asserting any and all Claims against the Debtors and Reorganized Debtors, and each of their respective employees, officials, Assets, property, rights, remedies, Claims, or Causes of Action of any nature whatsoever," again "[e]xcept as expressly provided in the Plan or [Confirmation Order]."[5] Id. ¶ 56(b). The Confirmation Order serves as a "judicial determination . . . of the discharge and release of all such Claims, Causes of Action or debt of or against the Debtors and the Reorganized Debtors pursuant to sections 524 and 944 of the Bankruptcy Code." Id. And it permanently enjoins "all Entities" holding discharged claims from

_____

[5] The reference to "employees" and "officials" appears in the Confirmation Order but not in the mirroring provision of the Commonwealth Plan itself, which instead reads "and each of their respective Assets, property and rights, remedies, Claims or Causes of Action or liabilities of any nature whatsoever." Comm. Plan § 92.2(b). Given this discrepancy, we lean on the language of the Confirmation Order as the document that prevails in case of conflict. See Conf. Order ¶ 84.

"commencing or continuing, directly or indirectly, . . . any action or other proceeding" on a discharged claim, again "[e]xcept as otherwise expressly provided." Id. ¶ 59.

This discharge language is broad. But it includes exceptions, most notably that its reach may be limited "as expressly provided in the Plan or [Confirmation Order]." Id. ¶ 56(a)—(b); see also id. ¶ 59. And the Confirmation Order's incorporated Findings of Fact and Conclusions of Law expressly state that "[t]he Plan does not provide for non-consensual third-party releases." FFCL ¶ 238. "Except as explicitly agreed to by the creditors in their respective plan support agreements, the Plan does not release any claims of a creditor of the Debtors, in its capacity as such, against a party that is not a Debtor." Id.

**2.**

The Board's argument relies on three textual hooks in the confirmed Commonwealth Plan: (1) the discharge of "all Claims or Causes of Action against the Debtors"; (2) the prohibition on asserting claims against Commonwealth "employees" and "officials"; and (3) the injunction against "commencing or continuing, directly or indirectly," any action or proceeding on a discharged claim. Together, the Board argues, this language forecloses "indirect efforts to recover from the Commonwealth through lawsuits against its 'employees' or 'officials' -- whether current or former, and regardless of capacity."

- 13 -

The problem for the Board is that its textual analysis is incomplete. All of the broad language upon which the Board relies does indeed appear in the confirmed Commonwealth Plan. But in each case, that broad language is preceded and cabined by the aforementioned exception: "[e]xcept as expressly provided" in other provisions of the Commonwealth Plan or Confirmation Order.[6] Conf. Order ¶¶ 56(a)-(b), 59. Accordingly, a determination that these personal-capacity claims fall within the broad umbrella cast by the language to which the Board points is only the first step of the analysis and does not answer the dispositive question of whether other express provisions of the confirmed Commonwealth Plan exclude these claims from discharge.[7]

As the Board concedes, the confirmed Commonwealth Plan "plainly does not" discharge claims against third parties. Indeed, that Plan expressly states that it "does not provide for non-consensual third-party releases," meaning that it "does not release any claims of a creditor of the Debtors . . . against a

---

[6] In its reply brief, the Board argues that Section 944 of the Bankruptcy Code governs the scope of claims discharged and discharges "all debts." 11 U.S.C. § 944(b). But Section 944(b) contains its own limiting language: it excludes from discharge "any debt . . . excepted from discharge by the plan or order confirming the plan." Id. § 944(c)(1).

[7] The Board briefly argues that its reading aligns with the goals of PROMESA, while a contrary reading would invite evasion of the protections set forth in the confirmed Commonwealth Plan. But the Board does not contend that PROMESA's broad goals should override the clear text of that Plan.

- 14 -

party that is not a Debtor." FFCL ¶ 238. But while the Board argues strenuously that the personal-capacity claims at issue are indirect claims against the Commonwealth rather than direct claims against the named defendants, it points to no authority -- nor offers any reasoning of its own -- to support the proposition that those categories are mutually exclusive. In short, the Board presents no rationale as to why a determination that these suits press indirect claims against the Commonwealth means that they somehow cease to also press direct claims against third parties.

It is true that the confirmed Commonwealth Plan's prohibition against asserting claims against Commonwealth "employees" and "officials" does not specify whether it applies only to official-capacity suits or also to personal-capacity suits. Conf. Order. ¶ 56(b). And without other textual or interpretive guidance, that lack of specificity might have led, as the Board claims it does, to the conclusion that all suits against employees and officials, regardless of capacity, are discharged. But three countervailing considerations point us in the other direction.

First, these personal-capacity claims are precisely the types of claims that circuit precedent establishes would require a third-party release to discharge. Second, the Supreme Court, in a post-Salgado decision, has emphasized that, in the analogous context of corporate bankruptcy, releasing claims against third

parties involves exercising a "radically different power" than releasing claims against the debtor -- a power with which bankruptcy courts are "not endow[ed]." Harrington v. Purdue Pharma L.P., 603 U.S. 204, 218, 220-21 (2024) (quotation marks omitted). And finally, we are mindful that, when concluding that the confirmed Commonwealth Plan does not discharge personal-capacity claims, the Title III court was interpreting its own Confirmation Order, and its conclusions are therefore entitled to deference. See Brown v. Harrington (In re Brown), 55 F.4th 945, 950 (1st Cir. 2022). We explain these considerations in turn.

### a.

We first explain why discharging these personal-capacity claims would amount to a non-consensual third-party release.[8]

"A non-consensual third-party release is the 'involuntary extinguishment of a non-debtor, third-party's claim against another non-debtor, third-party.'" Fin. Oversight & Mgmt. Bd. for P.R. v. Cooperativa de Ahorro y Credito Abraham Rosa (In re Fin. Oversight & Mgmt. Bd. for P.R.), 79 F.4th 95, 114 (1st Cir. 2023) (quoting Eamonn O'Hagan, On a "Related" Point: Rethinking Whether Bankruptcy Courts Can "Order" the Involuntary

---

[8] The Board, in addition to conceding that the Commonwealth Plan does not contain third-party releases, also does not argue that appellees otherwise consented to having their claims against these defendants in their personal capacities released. Any such release would therefore be a non-consensual one.

- 16 -

_Release of Non-Debtor, Third-Party Claims_, 23 Am. Bankr. Inst. L. Rev. 531, 531 (2015)).  Such releases prevent nondebtors (such as appellees here) from "prosecuting claims against other nondebtors," "primarily individuals associated with the debtors."  _Id._ at 115 (quoting Elizabeth D. Lauzon, Annotation, _Validity of Non-Debtor Releases in Bankruptcy Restructuring Plans_, 18 A.L.R. Fed. 3d Art. 2 § 2 (2016)).

In _Cooperativa_, we had occasion to clarify the nature of third-party releases and provided the following as an example of such a release:

> For example, sometimes a debtor corporation's reorganization plan may include language releasing that corporation's non-debtor directors from liability to the corporation's creditors (or to non-creditor third parties) for claims arising from their management of the corporation, because that liability could otherwise adversely impact the estate and threaten the distribution of assets as set out in the plan (if, say, the debtor-corporation would be required to indemnify its directors against such claims).

_Id._  This example is a near point-for-point match for this case. If releasing claims against a debtor-corporation's directors in the face of a mandatory indemnification scheme amounts to a third-party release, then so too must releasing claims against a governmental debtor's officers in the face of a permissive indemnification scheme like Law 9.  And since the parties and the Title III court all agree that the confirmed Commonwealth Plan

does not contain non-consensual third-party releases, that Plan cannot release these personal-capacity claims against Commonwealth employees and officials.

**b.**

Nor is it clear, under recent Supreme Court precedent, whether the Title III court could have approved the Commonwealth Plan if it did include non-consensual third-party releases.

In the time between our decision in Salgado and the Title III court's decision in appellees' case, the Supreme Court issued Harrington v. Purdue Pharma L.P., 603 U.S. 204 (2024). In Purdue, the Court confronted the question of whether a bankruptcy court in Chapter 11 proceedings could release claims against the owners of a debtor-corporation (who had not themselves filed for bankruptcy) without the consent of those holding such claims. Id. at 209, 211–12, 215.

The Court held that the bankruptcy court could not. Id. at 227. It characterized the "power to discharge the debts of . . . nondebtor[s]," like the corporation's owners, "without the consent of affected nondebtor claimants" as a "'radically different' power" than discharging the debts of the debtor. Id. at 218 (quoting Epic Sys. Corp. v. Lewis, 584 U.S. 497, 513 (2018)). And the Court concluded that "a bankruptcy court's powers are not limitless and do not endow it with the power to extinguish without their consent claims held by nondebtors . . . against

- 18 -

other nondebtors." Id. at 220-21. It is true that Purdue interpreted the Bankruptcy Code and that, while PROMESA incorporates many provisions of that Code, it also has many differences. That being said, the Board identifies no relevant provision of PROMESA granting discharge powers to the Title III court greater than those granted to bankruptcy courts under the Bankruptcy Code. So the Purdue Court's discussion of the limits of a bankruptcy court's power to non-consensually extinguish claims held by nondebtors against nondebtors at the very least colors our reading of the discharge terms in this case. Cf. Cuevas v. United States, 778 F.3d 267, 272-73 (1st Cir. 2015) ("[F]ederal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when, as here, a dictum is of recent vintage and not enfeebled by any subsequent statement." (quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991))).

The Supreme Court's treatment of derivative claims points in the same direction. See Purdue, 603 U.S. at 219-20. Such claims, although asserted by third-party plaintiffs against other third parties, can nevertheless be settled in bankruptcy proceedings. Id. at 219; id. at 261 (Kavanaugh, J., dissenting). The Purdue dissent argued that settling such claims extinguishes the named plaintiffs' derivative claims without their consent -- and thus suggests a more expansive view of a bankruptcy

- 19 -

court's power to extinguish third-party claims. Id. at 261 (Kavanaugh, J., dissenting). The majority dismissed this argument as containing a "glaring flaw" -- "[i]n a derivative action, the named plaintiff is only a nominal plaintiff. The substantive claim belongs to the corporation." Id. at 219 (majority opinion) (quotation marks omitted). And that is precisely "why a bankruptcy court may resolve derivative claims": "because those claims belong to the debtor's estate." Id.

The Court's distinction between derivative claims nominally held by third parties but substantively belonging to a debtor-corporation and claims that truly belong to third parties is analogous to the distinction between official-capacity and personal-capacity suits against government officials. Official-capacity suits are "only nominally against the official and in fact [are] against the official's office and thus the sovereign itself." Lewis v. Clarke, 581 U.S. 155, 162 (2017). In personal-capacity suits, in contrast, "the real party in interest is the individual, not the sovereign," id. at 163, and any ensuing judgment is "against the individual defendant, rather than against the entity that employs him," Kentucky v. Graham, 473 U.S. 159, 167-68 (1985).

In sum, the Purdue Court, interpretating the Bankruptcy Code, distinguished between (1) claims nominally held by third parties, which can be settled in the ordinary course of bankruptcy

proceedings because they substantively belong to the debtor, and (2) claims truly belonging to third parties, which cannot be so resolved.[9] Along similar lines, we now distinguish, in the context of Title III proceedings, between discharging (1) official-capacity claims, which are only nominally against third parties; and (2) personal-capacity claims, in which the named nondebtor defendant is the true party in interest. Discharging the former is akin to the rather prosaic discharge of a claim against the debtor -- while discharging the latter would represent at best a radical exercise untethered from any obvious source of authority.

## c.

We turn finally to the deference due to the Title III court's determination that the confirmed Commonwealth Plan does not release personal-capacity claims. Reaching that decision required the Title III court to "interpret[] its own order of confirmation." Monarch Life Ins. Co. v. Ropes & Gray, 65 F.3d 973, 983 (1st Cir. 1995). As we have observed in the bankruptcy context, "[e]ven though our interpretation of the confirmation order essentially presents a question of law," which usually engenders de novo review, "customary appellate deference is appropriate in these circumstances." Id.; see also Brown, 55 F.4th

---

[9] The Purdue Court held open the possibility that such claims could be discharged through a consensual third-party release, 603 U.S. at 226, but there is no such consensual release at issue here. See supra note 8.

at 950 ("[W]e owe deference to the Bankruptcy Court's interpretation of its own order . . . ." (citing Monarch Life, 65 F.3d at 983 & n.12)); La Liga de Ciudades de P.R. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 110 F.4th 295, 321 (1st Cir. 2024) ("A court asked to construe the scope and meaning of its own order is no doubt a persuasive authority."); Travelers Indem. Co. v. Bailey, 557 U.S. 137, 151 n.4 (2009) (noting that "[n]umerous Courts of Appeals have held that a bankruptcy court's interpretation of its own confirmation order is entitled to substantial deference" but finding it unnecessary to "determine the proper standard of review" for such an interpretation).

Notably, it is only in the Title III court's own Confirmation Order -- the document to which such deference extends -- that the language regarding "employees" and "officials" appears. The Title III court held that this language (and the use of the term "indirectly"), rather than evincing an intent to discharge personal-capacity suits, simply "recognize[s] that the effect of the discharge cannot be circumvented by the legal fiction of official capacity lawsuits." In re Fin. Oversight & Mgmt. Bd., 802 F. Supp. 3d at 361 n.10. The Title III court, which "was directly engaged in the give-and-take of the confirmation proceedings," Monarch Life, 65 F.3d at 983, undoubtedly had a

strong vantage point from which to discern which claims the confirmed Commonwealth Plan sought to discharge.

The Board nevertheless faults the Title III court's interpretation for, in the Board's view, rendering the terms "employees" and "officials" superfluous (insofar as they mean the same thing as "indirectly") and adding language to the confirmed Commonwealth Plan that limits its reach to only official-capacity suits. But the court's interpretation does not rely on adding language, since the confirmed Commonwealth Plan already explicitly states that it does not include third-party releases -- and the Board's surplusage argument, whatever its merits in a vacuum, cannot override that plain text. Ultimately, the Board's criticisms are insufficiently persuasive to overcome the deference due to the Title III court's interpretation of its own Confirmation Order. Nor do those criticisms sufficiently undermine our own conclusion that discharging personal-capacity claims would constitute a non-consensual third-party release, thereby running afoul of the Plan's plain language and diverging from the Supreme Court's reasoning in Purdue.

In sum, we are persuaded by the Title III court's interpretation of its own order, particularly where our own analysis points to the same result.

- 23 -

**IV.**

For the foregoing reasons, we <u>affirm</u> the decision of the Title III court in full.